**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4404

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JAMES CURTIS DENTON,

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Louise W. Flanagan, District Judge. (5:16-cr-00060-FL-3)

Argued: October 30, 2019                         Decided: November 25, 2019

Before NIEMEYER, KING, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Judge Wynn joined. Judge Wynn wrote a separate concurring opinion.

**ARGUED:** Kelly Margolis Dagger, ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellant. Evan M. Rikhye, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Paul K. Sun, Jr., ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellant. Robert J. Higdon, Jr., United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, Banumathi Rangarajan, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

KING, Circuit Judge:

Following a jury trial in the Eastern District of North Carolina, defendant James Curtis Denton was convicted of conspiring to distribute fifty grams or more of a mixture or substance containing methamphetamine, in contravention of 21 U.S.C. § 846 (the "drug conspiracy offense"). Denton was also convicted of possessing an unregistered destructive device, in violation of 26 U.S.C. § 5861(d), transporting an explosive while being an unlawful user of a controlled substance, in contravention of 18 U.S.C. § 842(i)(3), and transporting an explosive with knowledge and intent to kill, injure, or intimidate, in violation of 18 U.S.C. § 844(d) (collectively, the "explosive offenses"). On appeal, Denton primarily challenges his conviction on the drug conspiracy offense, arguing that the evidence fails to establish that he conspired to distribute fifty grams of methamphetamine and that the jury instructions were fatally defective.[1] Denton also pursues other contentions of evidentiary error with respect to the drug conspiracy and explosive offenses. As explained below, we reject each of Denton's contentions and affirm the judgment.

---

[1] The term "methamphetamine" refers to a mixture or substance containing methamphetamine unless otherwise indicated.

I.

A.

Denton, who grew up in and around Johnson and Wake Counties in North Carolina, first met Kristi Hicks in 2006. They were married in 2008. Shortly thereafter, they had two children together. But starting in 2010, Denton and Hicks separated several times because of Denton's "temper and his drinking." *See* J.A. 169.[2] Denton and Hicks's longest period of separation lasted for almost a year, from 2012 to 2013. In March 2014, after attempting to reconcile, Hicks — frightened by Denton's worsening temper and suspected drug use — left Denton for good. By July 2015, Denton and Hicks were divorced.

While they were separated — first, from 2012 to 2013 and, later, in 2014 — Denton and Hicks both dated other people. But Denton did not like it when Hicks dated other men. He threatened Hicks and the men that she dated, often becoming violent. On one occasion — during their 2012 to 2013 separation — Denton drove from Charlotte to Raleigh, North Carolina, to disrupt a dinner date between Hicks and Nathan Baker. At the restaurant, Denton placed Baker in a chokehold and warned him never to see Hicks again. Another time, Denton waited at Baker's apartment for Hicks and Baker to return from attending New Year's Eve festivities. When the couple arrived at Baker's apartment, Denton tackled

---

[2] Citations herein to "J.A.__" refer to the contents of the Joint Appendix filed by the parties in this appeal. We relate the facts in the light most favorable to the prosecution in that the jury returned a verdict in its favor. *See United States v. Miltier*, 882 F.3d 81, 86 (4th Cir. 2018) (recognizing that "[w]e must uphold a jury verdict if there is substantial evidence, viewed in the light most favorable to the [g]overnment, to support it").

3

Baker, causing him to tumble down a flight of stairs. Baker's injuries from the fall required stitches.

In October 2014, after separating from Denton permanently, Hicks began dating Curtis Chase Farmer. And as he had with Baker, Denton threatened and ultimately became violent with Farmer. At first, Denton would send threatening text messages to Farmer through Facebook Messenger. In one message, Denton warned Farmer: "You have spent 2 weekend with a man wife who he still cares about so if I was you and in joyed waking up everyday I would walk away and never go back and just for my health I wouldn't even tell her about this text and if you are as smart as I think you are you well do the right thing." *See* J.A. 214-15.

Additionally, Denton stalked and threatened Hicks. He made threatening phone calls and sent threatening text messages "all the time." *See* J.A. 184. And on the night of October 11, 2014, Denton attempted to force his way into Hicks's home. Hicks continued to receive threatening phone calls and text messages thereafter. On October 27, 2014, based on Denton's incessant abuse, Hicks obtained a domestic violence protection order against Denton. The order remained effective for two years and, among other things, prohibited Denton from contacting Hicks in-person, by phone, or by e-mail. Denton, however, was undeterred. Especially pertinent here, in early May 2015, Denton violated the protection order by calling Hicks from an unknown number. Hicks told Denton to stop attempting to contact her and ended the call.

Later that month, on May 28, 2015, Farmer — who was then living with Hicks — left their home on Moneta Lane in Cary, North Carolina, to get gas and cigarettes. Because

4

Denton had previously damaged cars belonging to men that Hicks dated, Farmer inspected his Ford Explorer before getting into it. Once satisfied that the Explorer was safe to drive, Farmer climbed in and drove out of the neighborhood. He did not get far. When Farmer was "30 or 40 yards from the end of the neighborhood," he "felt and noticed a big boom" that "lifted [his] car off the ground." *See* J.A. 158. A neighbor, David Riggs, who was driving behind Farmer, observed a nearby object that he believed had been lodged in the Explorer's tailpipe. Riggs picked up the object — "an inch and a half diameter PVC pipe" with "gunpowder granules in the bottom of the pipe" — and immediately knew that it was a pipe bomb. *Id.* at 165-66. In the ensuing investigation, law enforcement identified Denton as the primary suspect.

## B.

One day after the pipe-bomb explosion, on May 29, 2015, Denton was arrested for violating Hicks's domestic violence protection order. Incident to Denton's arrest, a cell phone belonging to him was located on his person. Shortly thereafter, law enforcement officers applied for and received a warrant to search his cell phone. The results of that search suggested that Denton had been involved in drug trafficking activity. More specifically, investigators uncovered Facebook messages in which Denton discussed trafficking methamphetamine and other drugs with numerous individuals.

Based on those incriminating messages, investigators subpoenaed Facebook for the records from Denton's Facebook account. At trial, those records and the accompanying business record certification from Facebook were admitted into evidence without objection. Investigators also subpoenaed Google and Time Warner Cable for subscriber

5

and IP address information relating to the e-mail address youknowbetter091@gmail.com. Months after the explosion, Denton — masquerading as Farmer — had used that e-mail address to send a threatening e-mail message to Hicks that "basically [said] that [she] should let the kids see their dad, that everybody will be better off if [she] just do[es] what he wants." *See* J.A. 226. Google's and Time Warner Cable's records indicated that youknowbetter091@gmail.com was registered to "Curtis Farmer"; however, the threatening e-mail was sent from an IP address affiliated with the name "Carolina Auto Recovery Specialists" — a business owned by Denton's brother. As with the Facebook records, those records and accompanying business record certifications were later admitted into evidence at trial without objection.

The search of Denton's cell phone also connected him to Marcus Williams ("M. Williams"), a suspected methamphetamine cook. On November 13, 2015, investigators executed a search warrant at M. Williams's house in Garner, North Carolina. The search uncovered various paraphernalia required to manufacture methamphetamine using the "shake-and-bake" method, plus methamphetamine residue and pseudoephedrine pills. Suspecting that Denton was involved with M. Williams's methamphetamine manufacturing operation, the investigators obtained Denton's and his then-girlfriend, Angela Trogdon's records from the National Precursor Log Exchange (the "NPLEx"), which is a national pseudoephedrine tracking database.

Pseudoephedrine is an active ingredient in certain formulations of over-the-counter cold medicine and an essential ingredient for cooking methamphetamine. Because pseudoephedrine is a precursor for methamphetamine, most of the states have limited the

amount of pseudoephedrine that a single individual can purchase. In North Carolina, an individual's pseudoephedrine purchases cannot exceed 3.6 grams per day — about one or two boxes of cold medicine — or nine grams per month, and all purchases are recorded in the NPLEx. *See* J.A. 290-91; *see also* N.C. Gen. Stat. §§ 90-113.52A(a), 90-113.53(a)-(b). If an individual's NPLEx records indicate that he has already reached the daily or monthly pseudoephedrine purchase limit, North Carolina retailers are prohibited from selling additional pseudoephedrine to that individual. *See* J.A. 291; *see also* N.C. Gen. Stat. § 90-113.52A(a). Because the manufacture of methamphetamine requires a lot of pseudoephedrine, these purchase limits force methamphetamine cooks to enlist others to procure boxes of cold medicine. To that end, law enforcement agencies often use NPLEx records to identify those individuals whose pseudoephedrine purchase patterns suggest their involvement in a conspiracy to produce methamphetamine.

According to Denton's NPLEx records, Denton successfully purchased thirteen boxes of pseudoephedrine between January 2014 and January 2015. And his records revealed that in December 2014 he was blocked from purchasing pseudoephedrine because he had already exceeded the monthly purchase limit. The NPLEx records for Trogdon, showed that she also purchased twelve boxes of pseudoephedrine between January 2014 and January 2015. On two of these occasions, Denton's and Trogdon's records indicated that they made their pseudoephedrine purchases together.

C.

On August 2, 2016, the grand jury in the Eastern District of North Carolina returned the operative nine-count second superseding indictment (the "Indictment"), charging

7

Denton and four coconspirators — Melissa Goodwin, Craig Williams ("C. Williams"), M. Williams, and Trogdon — with the drug conspiracy offense. The conspiracy was alleged to have begun by January 2014 and to have ended on May 3, 2016. The Indictment also charged Denton with the explosive offenses.

Unlike his coconspirators in the drug conspiracy, Denton pleaded not guilty, and his trial commenced on October 23, 2017. Prior to trial, the government gave notice of its intention to introduce certain bad acts evidence that was intrinsic to the explosive offenses. Among other things, that evidence included that Denton threatened and assaulted Baker and that Hicks secured the domestic violence protection order of October 27, 2014, against Denton. At trial, the bad acts evidence was presented without objection.

To support the drug conspiracy offense, the government presented approximately eleven witnesses. Those witnesses included ATF Special Agent Stephen Babits, six witnesses familiar with Denton's methamphetamine use and methamphetamine trafficking activities, and all four of Denton's indicted coconspirators.

The six witnesses familiar with Denton's methamphetamine use and methamphetamine trafficking activities testified thusly:

- Denton's friend Tyler Dahlke testified that he bought Denton a box of pseudoephedrine "once or twice," and, at Denton's request, allowed methamphetamine to be stored in his car for someone to pick up. *See* J.A. 370-71. Dahlke also observed that Denton used methamphetamine "all the time." *Id.* at 370.

- Veronica Hart testified that she purchased methamphetamine from M. Williams between 2008 and 2014. When Hart purchased methamphetamine from M. Williams, she sometimes paid with cash. But she would also regularly exchange boxes of pseudoephedrine with M. Williams "for a half a gram of methamphetamine" per box. *See*

8

J.A. 377. Additionally, Hart witnessed Denton bring M. Williams boxes of pseudoephedrine and use methamphetamine.

- M. Williams's friend and neighbor Jyles Coggins confirmed that he brought M. Williams boxes of pseudoephedrine "30, 40" times. *See* J.A. 386. In return, M. Williams would give Coggins methamphetamine, cash, or both methamphetamine and cash. Coggins explained that Denton would bring M. Williams "a lot of [pseudoephedrine] pills" and that Denton provided M. Williams with "a bigger amount" of pseudoephedrine than "everybody else." *Id.* at 387-88. And Coggins described how Denton frequently hung out at M. Williams's house and smoked methamphetamine. On at least one occasion, Denton offered to sell Coggins pills or cocaine.

- Denton's friend Kelli Thompson testified that she would exchange boxes of pseudoephedrine with Denton for drugs other than methamphetamine. Thompson explained that once she learned that pseudoephedrine was used to cook methamphetamine, she "knew he was making [methamphetamine]." *See* J.A. 407. Indeed, Denton once told Thompson, "I make my own shit," which Thompson understood to mean methamphetamine. *Id.* Thompson occasionally used methamphetamine with Denton, but he always gave it to her for free.

- Another of Denton's friends, Amy Smith, confirmed that, on at least one occasion, Denton sold her methamphetamine for $100 per gram.

- M. Williams's friend Jerry Adams confirmed that he purchased either half a gram or one gram of methamphetamine from M. Williams "probably 50, 60 times" between mid-2014 and 2016. *See* J.A. 436. On "five, six, seven occasions," Adams brought a box of pseudoephedrine to M. Williams instead of paying cash for methamphetamine. *Id.* at 436-37. Adams explained that a box of pseudoephedrine could be exchanged for "half a gram" of methamphetamine. *Id.* And Adams observed Denton bring M. Williams boxes of pseudoephedrine "six to eight" times. *Id.* at 439. Overall, Adams saw M. Williams give Denton methamphetamine "[f]ifteen to 20 times maybe over the course." *Id.*

Similarly, the trial testimony of Denton's four cooperating coconspirators regarding Denton's methamphetamine use and methamphetamine trafficking activities was, inter alia, as follows:

- Goodwin testified that Denton would bring boxes of pseudoephedrine to M. Williams and his brother, C. Williams, in exchange for methamphetamine. Including Denton, Goodwin observed "five to ten" persons exchange boxes of pseudoephedrine for methamphetamine with M. Williams. *See* J.A. 449-50. And Goodwin explained that Denton would visit M. Williams a "few times a week, a couple times a week," and use methamphetamine and cocaine at M. Williams's kitchen table. *Id.* at 450.

- C. Williams explained that Denton would regularly come over to M. Williams's house to "get high." *See* J.A. 468. Like Goodwin, C. Williams confirmed that Denton would bring boxes of pseudoephedrine to exchange for methamphetamine.

- M. Williams confirmed that Denton provided him with boxes of pseudoephedrine in exchange for methamphetamine. And Denton "[o]ccasionally" purchased methamphetamine from M. Williams with cash. *See* J.A. 488. M. Williams estimated that he provided Denton with "maybe a gram a week or . . . half a gram a week" for at least a year. *Id.* at 488-89.

- Trogdon confirmed that she bought M. Williams boxes of pseudoephedrine, which he used to cook methamphetamine. Sometimes, she purchased that pseudoephedrine with Denton. Trogdon also described how, "a couple times a month," Denton would arrange to exchange half a gram of methamphetamine or $50 for a box of pseudoephedrine with three other individuals. *See* J.A. 522. And Trogdon explained that between 2013 and September 2015, she and Denton used "maybe a half a gram to a gram [of methamphetamine] a week." *Id.* at 523.

At the close of the government's case-in-chief, Denton moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, on the ground that the government failed to present evidence of an interstate commerce nexus. But

Denton did not specify the offenses that the motion concerned, and it was denied by the district court. Shortly thereafter, before the court instructed the jury, Denton renewed his Rule 29 motion for judgment of acquittal, this time arguing that the government failed to prove that at least fifty grams of methamphetamine could be attributed to him and requesting that the court instead instruct the jury on the lesser-included offense as to the drug conspiracy. The court denied this motion but included on the verdict form the lesser offense of conspiracy to distribute less than fifty grams of methamphetamine.

The jury returned its verdict on October 25, 2017, finding Denton guilty of the drug conspiracy offense and the explosive offenses. In response to the verdict form's interrogatory concerning the methamphetamine quantity attributable to Denton, the jury marked with an "X" the blank corresponding to "50 grams or more of a mixture or substance containing detectable amount of methamphetamine." *See* J.A. 774. Thereafter, the district court conducted Denton's sentencing hearing on June 7, 2018. Denton was sentenced to 360 months in prison for the drug conspiracy offense and to concurrent terms of 120 months in prison for each of the explosive offenses. Denton timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

To start, we address Denton's contentions concerning his conviction of the drug conspiracy offense. First, Denton contests the sufficiency of the evidence to prove the threshold methamphetamine quantity for the offense. Second, he maintains that the district court contravened our decision in *United States v. Collins*, 415 F.3d 304 (4th Cir. 2005),

11

by failing to instruct the jury to calculate the threshold methamphetamine quantity attributable to him beyond a reasonable doubt according to the principles of *Pinkerton v. United States*, 328 U.S. 640 (1946) (recognizing that acts in furtherance of conspiracy are attributable to other coconspirators when they are reasonably foreseeable consequences of unlawful agreement).

A.

We first assess Denton's contention that the evidence was insufficient to prove that he conspired to distribute fifty grams of methamphetamine. In assessing a challenge to the sufficiency of the evidence, "we view the evidence in the light most favorable to the prosecution and decide whether substantial evidence supports the verdict." *See United States v. Jeffers*, 570 F.3d 557, 565 (4th Cir. 2009) (internal quotation marks omitted). Substantial evidence exists when, drawing "all reasonable inferences from the facts proven to those sought to be established by the government," any "rational trier of fact could have found the essential elements" of the offense beyond a reasonable doubt. *See United States v. Lefsih*, 867 F.3d 459, 465 (4th Cir. 2017) (internal quotation marks omitted). To that end, we are cognizant that assessing the credibility of witnesses and resolving contradictory testimony, weighing the evidence, and drawing "reasonable inferences from basic facts to ultimate facts" is solely the responsibility of the jury. *See United States v. Robinson*, 855 F.3d 265, 268 (4th Cir. 2017) (internal quotation marks omitted).

The Indictment alleged that the amount of methamphetamine "in the conspiracy attributable to each defendant as a result of his or her own conduct and the conduct of other conspirators reasonably foreseeable to him or her is fifty (50) grams." *See* Indictment 4.

Accordingly, in order to convict Denton of the drug conspiracy offense, the government was obliged to prove beyond a reasonable doubt that at least fifty grams of methamphetamine were attributable to Denton. *See United States v. Brooks*, 524 F.3d 549, 556-58 (4th Cir. 2008). In the context of a drug trafficking conspiracy, we have explained that coconspirators' drug transactions can be imputed to an individual defendant for the purpose of determining the drug quantity attributable to him where the transactions are "reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.* at 557 n.16; *see also United States v. Irvin*, 2 F.3d 72, 76-77 (4th Cir. 1993) (concluding that reasonably foreseeable drug transactions of coconspirators are properly attributed to individual defendant in drug conspiracy prosecution). And, importantly, we have observed that when the prosecution has presented "evidence of a number of [drug] transactions," a "conservative" estimate of drug quantity may be calculated by multiplying the number of transactions by "an average weight-per-transaction." *See United States v. Hickman*, 626 F.3d 756, 769 (4th Cir. 2010) (internal quotation marks omitted).

During the trial, numerous witnesses confirmed that Denton had regularly purchased methamphetamine from M. Williams, spent considerable amounts of time at M. Williams's home while M. Williams cooked and sold methamphetamine, and frequently supplied M. Williams with pseudoephedrine. And, critically, several witnesses explained that a box of pseudoephedrine could be exchanged for half a gram of methamphetamine. M. Williams confirmed that Denton obtained between half a gram to one gram of methamphetamine from him every week for at least a year. Although Denton presumably did not purchase any methamphetamine during the sixty days in 2015 that he spent in jail for violating

13

Hicks's domestic violence protection order, the jury could nevertheless find that Denton had procured at least 21.7 grams of methamphetamine from M. Williams. Additionally, Denton often exchanged half a gram of methamphetamine or $50 for individual boxes of pseudoephedrine with three persons. Further, Smith confirmed that Denton sold her at least one gram of methamphetamine. Thus, the government presented evidence that, at a minimum, 23.45 grams of methamphetamine were directly attributable to Denton.[3]

The government also presented evidence of Denton's coconspirators' acts in furtherance of the drug conspiracy. Adams confirmed that M. Williams sold him half a gram or one gram of methamphetamine fifty or sixty times from mid-2014 to 2016. And Trogdon confirmed that she and Denton would purchase boxes of pseudoephedrine together. Indeed, Trogdon's NPLEx records showed that she purchased twelve boxes of

---

[3] Consistent with *Hickman*, in calculating the methamphetamine quantity resulting from Denton's purchases from M. Williams, we can assume that each of Denton's purchases were for half a gram of methamphetamine. *See* 626 F.3d at 769 (observing that "conservative extrapolation" of drug quantity from "*evidenced* transactions is perfectly proper" (emphasis in original)). Furthermore, in order to avoid duplication, we assume that the thirteen boxes of pseudoephedrine that Denton bought between 2014 and 2015 are accounted for in M. Williams's testimony that he provided Denton with half a gram to one gram of methamphetamine every week for at least a year. Because Trogdon recalled that Denton exchanged either methamphetamine or cash for pseudoephedrine with three persons, we have assumed that Denton provided methamphetamine in only half of those exchanges. And although the jury could credit Trogdon's testimony that Denton facilitated the exchanges "a couple times a month," we have assumed that the exchanges occurred only once with each person. *See* J.A. 522. Based on the evidence presented at trial, however, the jury would not have been constrained by our conservative assumptions.

pseudoephedrine between 2014 and 2015. Trogdon further explained that she would exchange those boxes of pseudoephedrine with M. Williams for methamphetamine or cash. Coggins also confirmed that he exchanged boxes of pseudoephedrine for methamphetamine, cash, or both methamphetamine and cash between thirty and forty times. Conservatively, the government proved that M. Williams provided Adams, Trogdon, and Coggins with 35.5 grams of methamphetamine.[4]

Although Denton asserts that M. Williams's transactions with Adams and Coggins were not reasonably foreseeable, Adams and Coggins both testified that Denton was present on various occasions when they purchased methamphetamine or traded pseudoephedrine for methamphetamine. Moreover, M. Williams's distribution of methamphetamine to other users was a natural consequence of Denton's efforts to supply M. Williams with pseudoephedrine — a difficult to obtain, but critical ingredient for cooking methamphetamine. Therefore, the jury was entitled to attribute M. Williams's transactions to Denton.

In short, viewed in the light most favorable to the government, there was substantial evidence that Denton conspired to distribute fifty grams or more of methamphetamine. A

---

[4] As with Denton's methamphetamine purchases, to reach a conservative estimate of Adams's methamphetamine purchases from M. Williams, we assume that each purchase was for half a gram of methamphetamine. And because both Trogdon and Coggins recalled that M. Williams would exchange either methamphetamine or cash for a box of pseudoephedrine, to reach a conservative estimate of the amount of methamphetamine exchanged for pseudoephedrine, we assume that Trogdon and Coggins received methamphetamine in return for only half of the boxes of pseudoephedrine that they procured. Notwithstanding, the jury would not have been so constrained.

15

reasonable trier of fact was therefore entitled to find Denton guilty of the drug conspiracy offense, and we reject Denton's contention in this regard.

B.

Next, we assess Denton's contention that the district court committed error by failing to instruct the jury to determine the methamphetamine quantity attributable to him beyond a reasonable doubt using the principles of *Pinkerton*. Denton asserts that the error requires that his conviction of the drug conspiracy offense be vacated and that he be awarded a new trial.

In 2005, in *Collins*, we concluded that a trial court must "instruct a jury to use *Pinkerton* principles" to determine the quantity of drugs attributable to an individual participant in a drug conspiracy. *See* 415 F.3d at 314. Under the Supreme Court's decision in *Pinkerton*, acts in furtherance of a conspiracy are attributable to other coconspirators "for the purpose of holding them responsible for the substantive offense" when those acts are "reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *See* 328 U.S. at 647-48; *see also Brooks*, 524 F.3d at 557 n.16 (explaining *Pinkerton* principles underlying *Collins*). We have since emphasized that, "in order to properly apply the sentencing provisions of § 841(b)(1) in a § 846 drug conspiracy prosecution," *Collins* requires the jury to determine beyond a reasonable doubt that the threshold drug quantity specified in § 841(b)(1) was reasonably foreseeable to the defendant. *See Jeffers*, 570 F.3d at 569.

The district court instructed the jury that, if it found Denton guilty of the drug conspiracy offense, it was obliged "to determine the quantity of methamphetamine that the

16

Defendant conspired to distribute and/or possess with the intent to distribute." *See* J.A. 699. And the verdict form required the jury to select a drug quantity of either "50 grams or more of a mixture or substance containing detectable amount of methamphetamine" or "[l]ess than 50 grams of a mixture or substance containing detectable amount of methamphetamine." *Id.* at 774. Notably, neither the court's instructions nor the verdict form explained that only methamphetamine that was reasonably foreseeable to Denton could be attributed to him for the purpose of satisfying the threshold methamphetamine quantity of fifty grams. By failing to articulate the legal principles that the jury was required to apply in order to determine the methamphetamine quantity attributable to Denton, the trial court committed a *Collins* error. *See Brooks*, 524 F.3d at 558-59. Denton did not, however, preserve an objection on the *Collins* issue at trial. Thus, we are constrained to review this contention for plain error only.[5]

In order to prevail under plain error review, Denton must establish that there was an error, that the error was plain — in other words, clear and obvious — and, finally, that the

---

[5] The government suggests that the Indictment, which was provided to the jury and charged that the methamphetamine quantity "attributable to each defendant as a result of his or her own conduct and the conduct of other conspirators reasonably foreseeable to him or her, is fifty (50) grams," may be considered in conjunction with the jury instructions in order to assess the *Collins* issue. *See* Indictment 4. We disagree. A statement of law articulated by the government in a charging document is simply not an instruction by the trial court and thus cannot satisfy *Collins*. *See Jeffers*, 570 F.3d at 569 (explaining that *Collins* requires jury instruction on determination of drug quantity attributable to defendant). In any event, the district court expressly instructed that the jury was obliged to "follow the law as stated by the [c]ourt," and not the parties. *See* J.A. 673-74. Accordingly, we will not presume that the jury contravened that instruction by turning to the legal principles articulated in the Indictment to determine the methamphetamine quantity attributable to Denton.

error affected his substantial rights. *See United States v. Olano*, 507 U.S. 725, 732-34 (1993). But even if that burden is met, we retain discretion to decline to correct the error unless it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 732 (internal quotation marks omitted). Critically, in *United States v. Foster*, we recognized that when the government has presented "overwhelming and essentially uncontroverted" evidence of the drug quantity attributable to a particular defendant, a *Collins* error does not seriously affect the fairness, integrity, or public reputation of judicial proceedings. *See* 507 F.3d 233, 252 (4th Cir. 2007) (quoting *United States v. Cotton*, 535 U.S. 625, 633 (2002)).

Here, the district court's jury instructions on the drug conspiracy offense constituted an error that was plain. *See Foster*, 507 F.3d at 250-51 (recognizing that failure to properly instruct jury under *Collins* is clear and obvious error). Based on the jury's drug quantity finding, Denton faced a statutory maximum sentence of forty years in prison for the drug conspiracy offense. *See* 21 U.S.C. § 841(b)(1)(B). Indeed, Denton was sentenced to 360 months, or thirty years, for the drug conspiracy offense. Absent the jury's drug quantity finding, Denton faced a statutory maximum sentence of only twenty years. *See* 21 U.S.C. § 841(b)(1)(C). Thus, the *Collins* error affected Denton's substantial rights. *See Foster*, 507 F.3d at 251-52 (recognizing that sentence in excess of applicable statutory maximum absent *Collins* error affects substantial rights).

We are satisfied, however, that the *Collins* error did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. The trial evidence overwhelmingly established that at least fifty grams of methamphetamine were attributable

18

to Denton, based on his substantial role in the drug conspiracy. The jury heard evidence that Denton regularly purchased methamphetamine from M. Williams, that he was one of M. Williams's biggest suppliers of pseudoephedrine, often recruiting others to purchase it, and that he sometimes sold methamphetamine or exchanged it for pseudoephedrine. Additionally, the jury heard evidence that M. Williams used the boxes of pseudoephedrine he received from Denton and others to manufacture methamphetamine, which he frequently sold while Denton was present. All of that evidence went essentially uncontroverted by Denton, whose trial strategy focused much more on the explosive offenses than the drug conspiracy offense. Accordingly, in these circumstances, we will decline to correct the plain *Collins* error.

## III.

Turning to the other issues presented in this appeal, Denton contends that his Sixth Amendment confrontation right was contravened by the admission of business record certifications from Facebook, Google, and Time Warner Cable. Denton additionally contends that the district court erred in admitting the bad acts evidence relating to his prior threats and assaults. Although Denton asserts that those errors entitle him to a new trial, we disagree.

## A.

Denton maintains that the district court erred in admitting into evidence the three business record certifications that the government relied upon in presenting business records from Facebook, Google, and Time Warner Cable. Denton also asserts that the error

19

was compounded by Special Agent Babits's testimony about the evidence of Denton's trafficking in methamphetamine and other drugs contained in the Facebook records.

1.

Denton first asserts that the admission of the three business record certifications submitted pursuant to Federal Rule of Evidence 902(11) violated his Sixth Amendment right to confront witnesses against him. *See* Fed. R. Evid. 902(11) (providing that certified records of a regularly conducted business activity are self-authenticating, and therefore "require no extrinsic evidence of authenticity in order to be admitted"). Because Denton did not present this contention to the trial court, it is reviewed for plain error only. Accordingly, Denton must establish an error that is plain and that substantially affected his rights. *See United States v. Olano*, 507 U.S. 725, 732 (1993).

At trial, the government presented business record certifications from Facebook, Google, and Time Warner Cable to authenticate the business records obtained therefrom. The Facebook records provided evidence of Denton's involvement in the trafficking of methamphetamine and other drugs. And the Google and Time Warner Cable records established that, several months after the pipe-bomb explosion, Denton impersonated Farmer and sent a threatening e-mail message to Hicks from the e-mail address youknowbetter091@gmail.com. The business record certifications themselves consisted of declarations signed under penalty of perjury from the records custodians verifying the authenticity of the documents as records maintained in the ordinary course of business. To be sure, those certifications were created for the purpose of investigating and prosecuting criminal activity. But, consistent with our unpublished and non-precedential opinion in

20

*United States v. Mallory*, we are unpersuaded that Denton's Sixth Amendment right to confront witnesses includes "the right to confront a records custodian who submits a Rule 902(11) certification" of a business record. *See* 461 F. App'x 352, 357 (4th Cir. 2012).[6]

In *Crawford v. Washington*, the Supreme Court made clear that a defendant's Sixth Amendment right to confront witnesses against him extends to all testimonial out-of-court statements unless the witness is unavailable and the defendant was afforded a prior opportunity for cross-examination. *See* 541 U.S. 36, 50-54 (2004). Statements are testimonial when their primary purpose "is to establish or prove past events potentially relevant to later criminal prosecution." *See Davis v. Washington*, 547 U.S. 813, 822 (2006). Accordingly, business records, "having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial," are not testimonial. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). Indeed, Denton does not dispute that the Facebook, Google, and Time Warner Cable records themselves were not subject to confrontation. And although affidavits generally fall within the "core class" of testimonial statements, *see Crawford*, 541 U.S. at 51, the Supreme Court has differentiated between an affidavit that is created "for the sole purpose of providing

---

[6] Though we are not bound by our opinion in *Mallory*, we are satisfied its reasoning on the confrontation issue is sound. Our confidence in *Mallory*'s conclusion that Rule 902(11) business record certifications are not subject to confrontation is bolstered by its agreement with other circuits that have concluded that the Sixth Amendment confrontation right is not implicated by business record certifications submitted pursuant to Rule 902(11). *See, e.g.*, *United States v. Yeley-Davis*, 632 F.3d 673, 680-81 (10th Cir. 2011) (concluding that Rule 902(11) business record certification is not subject to confrontation); *United States v. Adefehinti*, 510 F.3d 319, 328 (D.C. Cir. 2007) (same); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) (same).

evidence against a defendant" and an affidavit that is created to "*authenticate* or provide a copy of an otherwise admissible record," *see Melendez-Diaz*, 557 U.S. at 322-23 (emphasis in original). Put simply, the former is testimonial and therefore subject to confrontation, while the latter is not. *See id.*

As we first recognized in *Mallory*, *Melendez-Diaz* thus "makes clear that the Sixth Amendment right to confront witnesses does not include the right to confront a records custodian who submits a Rule 902(11) certification of a record that was created in the course of a regularly conducted business activity." *See Mallory*, 461 F. App'x at 357. Denton nevertheless seeks to conjure error by stressing that the business record certifications provided the foundation for improper testimony from Special Agent Babits regarding the contents of Denton's Facebook records. But that attempted bootstrapping of error yet fails to establish that the record certifications themselves are testimonial. We are similarly unpersuaded by Denton's assertion that we misapprehended *Melendez-Diaz* in *Mallory*. That is because Denton's argument entirely ignores *Mallory*'s express reliance on the distinction drawn in *Melendez-Diaz* between an affidavit created to provide evidence and an affidavit created to authenticate an otherwise admissible record. *See id.* at 356.

At bottom, the business record certifications from Facebook, Google, and Time Warner Cable did nothing more than authenticate the business records to which they pertain. We are thus satisfied that the district court's admission of those certifications did not contravene Denton's Sixth Amendment confrontation right.

22

2.

Denton also avers that the district court erred in allowing Special Agent Babits's testimony concerning Denton's Facebook records. In that regard, Denton maintains that Babits lacked personal knowledge of the Facebook records and improperly gave expert opinions. Because Denton did not object at trial to Babits's testimony on those grounds, we again review for plain error.

Most of Special Agent Babits's testimony concerning Denton's Facebook records — which were already admitted into evidence — involved reading portions of the records to the jury. Occasionally, Babits would explain certain terms, primarily drug slang, used in Denton's Facebook messages. For example, Babits explained that "Opana 20s" meant "20 milligrams of Opana" and that certain un-punctuated numbers referred to drug prices. *See* J.A. 327.

As an initial matter, we are unaware of any prohibition against a witness reading aloud from properly admitted evidence. *See United States v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015) (observing that "[law enforcement] agents are free to read aloud from admitted documents, even if there are minor discrepancies between the written and spoken texts"); *cf.* Fed. R. Evid. 602 advisory committee's note to 1972 proposed rules (explaining that the personal knowledge requirement for lay witness testimony is rooted in "the common law insistence upon the most reliable sources of information" (internal quotation marks omitted)). On the other hand, testimony by a law enforcement officer crosses the fine line between permissible lay opinion testimony and expert opinion testimony when it

23

is not based on personal perception, but rather on law enforcement experience and after-the-fact investigation. *See United States v. Johnson*, 617 F.3d 286, 292-93 (4th Cir. 2010).

To the extent that any of Special Agent Babits's testimony strayed over that line, however, we are satisfied that Denton's substantial rights were unaffected. At trial, several recipients of Denton's Facebook messages testified about the messages' content and defined the drug slang therein consistent with Babits's testimony. *See Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (recognizing that a defendant's substantial rights are not affected absent a showing of reasonable probability that "but for the error, the outcome of the proceeding would have been different" (internal quotation marks omitted)). We thus reject Denton's contention that allowing this aspect of Babits's testimony was plainly erroneous.

## B.

Denton finally contends that the district court erred in allowing the government to present evidence that Denton threatened and assaulted Baker while Baker and Hicks were dating, and that Hicks secured a domestic violence protection order against Denton, with which he refused to comply. Denton maintains that the bad acts evidence was extrinsic to the charged offenses and thus barred by Federal Rule of Evidence 404(b). Again, however, Denton failed to object to the introduction of the bad acts evidence at trial. We therefore review this final contention for plain error only.

Rule 404(b) prohibits the introduction of evidence of past crimes, wrongs, or other bad acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *See* Fed. R. Evid. 404(b)(1). But Rule

24

404(b) only excludes bad acts evidence that is extrinsic to the charged offense. *See United States v. Chin*, 83 F.3d 83, 87 (4th Cir. 1996). Acts that are intrinsic to the charged offense, by contrast, "do not fall under Rule 404(b)'s limitations on admissible evidence." *Id.* at 87-88. Bad acts are intrinsic to the charged offense "when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *Id.* at 88 (internal quotation marks omitted). And bad acts are "inextricably intertwined with the evidence regarding the charged offense if [they] form[] an integral and natural part of the witness's accounts of the circumstances surrounding" the charged offense. *See United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010) (internal quotation marks omitted). We have further explained that bad acts evidence is intrinsic when it is essential "to the story of the crime" or provides context to the charged offense. *See United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007); *see also United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994) (explaining that even evidence predating timeframe of indictment can be intrinsic).

Here, Denton's treatment of Baker was part of his pattern of threatening and violent conduct towards the men that his ex-wife Hicks dated and thus provided context to the explosive offenses. And the abusive conduct leading Hicks to secure a domestic violence protection order against Denton, and his violation thereof, were acts in the same course of conduct leading Denton to place a pipe bomb in Farmer's car. Accordingly, we are satisfied that the district court did not plainly err in this regard.

IV.

Pursuant to the foregoing, we reject each of Denton's contentions of error and affirm

the judgment of the district court.

*AFFIRMED*

WYNN, Circuit Judge, concurring in the judgment:

I fully concur in the majority's opinion and write separately to emphasize the reasons for finding the district court erred under *United States v. Collins*, 415 F.3d 304 (4th Cir. 2005).

In *Collins*, we addressed whether defendants found guilty of a drug conspiracy pursuant to 21 U.S.C. § 846 should be sentenced under 21 U.S.C. § 841(b) based on the quantity of drugs distributed by the entire conspiracy. 415 F.3d at 312. We concluded they should not. *Id.* at 314.

We first looked to our decision in *United States v. Irvin*, where we held the most reasonable interpretation of § 846 requires drug conspirators to receive the same penalty as would apply under the object offense of the conspiracy. 2 F.3d 72, 77 (4th Cir. 1993). Applying this interpretation in *Irvin*, we concluded that, for sentencing purposes, the district court must determine, by a preponderance of the evidence, the amount of narcotics attributable to each co-conspirator by relying on the principles of attribution set forth in *Pinkerton v. United States*, 328 U.S. 640 (1946). *Id.* In *Pinkerton*, the Supreme Court held acts in furtherance of a conspiracy are "attributable to the others for the purpose of holding them responsible for the substantive offense" underlying the conspiracy. 328 U.S. at 647.

*Collins* next applied the Supreme Court's mandate in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and our decision in *United States v. Promise*, 255 F.3d 150, 152 (4th Cir. 2001), to find that the jury, rather than the judge, must make the attribution finding of

27

*Irvin* beyond a reasonable doubt. *Collins*, 415 F.3d at 314.[1] *Collins* concluded a district court must "instruct a jury to use *Pinkerton* principles" when determining the amount of drugs "attributable" to a defendant in a drug conspiracy for purposes of applying the statutory maximums and minimums of § 841(b). *Id*. In so holding, we distinguished the guilt inquiry of § 846 from the sentencing inquiry of § 841(b). *Id*. at 312-13. The former merely depends on the existence of a conspiracy agreement. *Id*. The latter requires "further instruction relating to the factual predicate necessary for sentencing," that is, possession or distribution of some quantity of narcotics. *Id*.

Subsequently, in *United States v. Foster*, we clarified that an attribution finding requires the jury to "determine that the threshold drug amount was reasonably foreseeable to the individual defendant," whether through his or her own acts or through the acts of co-conspirators in furtherance of the conspiracy. 507 F.3d 233, 249, 251 n.10 (4th Cir. 2007).

We have repeatedly reaffirmed *Collins*'s requirement that in order to hold a drug conspiracy defendant responsible for a threshold amount under § 841(b), the jury must be instructed to consider: (1) the amount of narcotics with which the defendant was directly involved and (2) the amount of narcotics attributable to the defendant through the reasonably foreseeable actions of co-conspirators performed in furtherance of the

---

[1] *Apprendi* held, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In *Promise*, we applied *Apprendi* to find "in order to authorize the imposition of a sentence exceeding the maximum allowable without a jury finding of a specific threshold drug quantity, the specific threshold quantity must be . . . proved to the jury beyond a reasonable doubt." 255 F.3d at 156-57.

conspiracy. *Collins*, 415 F.3d at 314; *see United States v. Garcia-Lagunas*, 835 F.3d 479, 495-96 (4th Cir. 2016); *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Jeffers*, 570 F.3d 557, 569 (4th Cir. 2009); *United States v. Brooks*, 524 F.3d 549, 557-58 (4th Cir. 2008); *United States v. Reid*, 523 F.3d 310, 316 (4th Cir. 2008); *Foster*, 507 F.3d at 249; *United States v. Smith*, 441 F.3d 254, 273 (4th Cir. 2006).

Here, the district court directed no such finding. The written jury instructions contained a general description of conspiracy principles for purposes of determining Defendant's guilt or innocence under § 846 but were devoid of guidance on how to attribute to Defendant any of the drug quantities involved in the conspiracy for sentencing under § 841(b). [J.A. 753-60.] Nor did the special verdict form direct attribution. It read: "If your verdict is guilty, you are instructed to determine the quantity of methamphetamine the defendant conspired to distribute and/or possess with the intent to distribute." J.A. 774. The weight choices were "50 grams or more" or "[l]ess than 50 grams." J.A. 775. The form was otherwise silent on the quantity determination. Finally, in its bench instruction, the district court stated: "You will see if your verdict is guilty you are instructed to determine the quantity of methamphetamine the Defendant conspired to distribute and/or possess with the intent to distribute. You choose only one drug weight." J.A. 699.

Thus, the explicit direction the jury received only told it to determine the amount of methamphetamine "the Defendant conspired" to possess or distribute. J.A. 699, 774. At no point did the district court state, as required by *Collins*, *Foster*, and a long line of cases in this Circuit, that the jury must find the drug quantity attributable to Defendant, whether

29

through his own actions or the reasonably foreseeable actions of his co-conspirators in furtherance of the conspiracy. *See Collins*, 415 F.3d at 312; *Foster*, 507 F.3d at 249.

We have always found a bare instruction on the drug quantity a defendant "conspired" to possess or distribute insufficient under *Collins*. In *Jeffers*, as here, the district court merely provided an instruction on general conspiracy principles, instructing the jury that it had to find that "the object of the unlawful plan was to distribute or possess with intent to distribute at least 50 grams of a substance containing a detectable amount of cocaine base." 570 F.3d at 569. The district court continued, "once it has been shown that a conspiracy exists, the evidence need only establish, beyond a reasonable doubt, a slight connection between the defendant and the conspiracy to support conviction." *Id.* The verdict form stated: "Do you find *the defendant* . . . guilty beyond a reasonable doubt of knowingly *conspiring* to distribute or possess with the intent to distribute more than fifty (50) grams of a mixture or substance containing cocaine base?" *Id.* (emphasis added). We held "because there was no instruction requiring a jury determination of the quantity of cocaine base reasonably foreseeable to [defendant], *Collins* error was committed." *Id.* The government agreed. Brief of Appellee, *United States v. Jeffers*, 570 F.3d 557, 569 (4th Cir. 2009) (No. 06-5289), ECF No. 54 at 49.

The jury charge here is substantively indistinguishable from that in *Jeffers*. 570 F.3d at 569 [; J.A. 699, 753-60, 774-75]. In *Jeffers*, we recognized the risk that the defendant would be improperly sentenced, and we accordingly found *Collins* error. *See id.* There is no reason not to do the same in this case. *See also Rangel*, 781 F.3d at 741 (finding *Collins* error, acknowledged by the government, on collateral review when district court

30

provided instruction on general conspiracy liability and the only reference to drug weight was for the jury to find "the amount you find that was involved as to [the conspiracy charge]").

In contrast, when we have found no *Collins* error, we have done so because the district court explicitly directed the jury to find the quantity of drugs reasonably foreseeable to the defendant as a result of co-conspirator actions taken in furtherance of the conspiracy. In *United States v. Savoy*, a panel of this Court found no *Collins* error when the jury instruction read:

> [T]he defendant is accountable for the quantity of drugs which he personally distributed or possessed with intent to distribute . . . the defendant is also accountable for any quantity of drugs which another member of the conspiracy distributed or possessed with intent to distribute as part of the conspiracy, so long as it was reasonably foreseeable to the defendant, Mr. Savoy, that such a quantity of drugs would be involved in the conspiracy which he joined.

315 F. App'x 464, 472 (4th Cir. 2009) (per curiam). These instructions did not take the approach of the district court here — directing the jury to find the quantity of drugs the defendant conspired to possess or distribute. Rather, these instructions direct consideration of that quantity the defendant actually possessed or distributed, or such reasonably foreseeable quantities arising from the defendant's co-conspirators.

For the foregoing reasons, I join the majority opinion in finding *Collins* error in this case. Because our review is for plain error, although the evidence in this case shows Defendant was primarily a drug user who exchanged cash and pseudoephedrine for methamphetamine at M. Williams' house, I agree with the majority's holding affirming the judgment of the district court.