**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1684

DARRYL HOWARD,

       Plaintiff - Appellant,

v.

CITY OF DURHAM; DARRELL DOWDY, in his individual and official capacities; MICHELE SOUCIE, in her individual and official capacities; SCOTT PENNICA, in his individual and official capacities; JOHN AND JANE DOE OFFICERS & SUPERVISORS 1-10, in their individual and official capacities,

       Defendants - Appellees.

No. 22-1719

DARRYL HOWARD,

       Plaintiff - Appellee,

v.

DARRELL DOWDY, in his individual and official capacities,

       Defendant - Appellant,

and

CITY OF DURHAM; MICHELE SOUCIE, in her individual and official capacities; SCOTT PENNICA, in his individual and official capacities; JOHN AND JANE DOE OFFICERS & SUPERVISORS 1-10, in their individual and official capacities,

Defendants.

_____

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Thomas D. Schroeder, Chief District Judge.  (1:17-cv-00477-TDS-JEP)

_____

Argued:  March 10, 2023                                      Decided:  May 30, 2023

_____

Before KING, WYNN, and QUATTLEBAUM, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded by published opinion.  Judge Wynn wrote the opinion, in which Judge King joined. Judge Quattlebaum wrote a separate opinion concurring in part and dissenting in part.

_____

**ARGUED:**  Anna Benvenutti Hoffmann, NEUFELD SCHECK & BRUSTIN, LLP, New York, New York, for Appellant/Cross-Appellee.   James Nicholas Ellis, POYNER SPRUILL LLP, Rocky Mount, North Carolina; Reginald Bernard Gillespie, Jr., WILSON RATLEDGE, PLLC, Raleigh, North Carolina; Henry W. Sappenfield, KENNON, CRAVER, BELO, CRAIG & MCKEE, PLLC, Durham, North Carolina, for Appellees/Cross-Appellants.  **ON BRIEF:**  Amelia B. Green, NEUFELD SCHECK & BRUSTIN, LLP, New York, New York; Bradley J. Bannon, Narendra K. Ghosh, PATTERSON HARKAVY LLP, Chapel Hill, North Carolina, for Appellant/Cross-Appellee.  Eric P. Stevens, Sarah V. Fritsch, POYNER SPRUILL LLP, Raleigh, North Carolina; Michele L. Livingstone, KENNON CRAVER, PLLC, Durham, North Carolina, for Appellees/Cross-Appellants.

_____

2

WYNN, Circuit Judge:

In 1995, Plaintiff Darryl Howard was convicted of a double murder in Durham, North Carolina. But after new exculpatory DNA evidence was discovered, a state superior court judge vacated Howard's conviction, and he was released after 21 years in prison.

Howard then filed this civil rights action for his wrongful conviction. Ultimately, a jury found that former Durham Police Department Officer Darrell Dowdy violated Howard's constitutional rights during the murder investigation, and it awarded Howard $6 million.

On appeal, Howard asks this Court to reverse the district court's dismissal on summary judgment of his claims against the City of Durham and two other officers, Scott Pennica and Michele Soucie. He also seeks a new damages trial, arguing that the jury's award was impacted by improper character evidence. On cross-appeal, Dowdy asks this Court to set aside the jury verdict and remand for a new trial.

We affirm the jury verdict against Dowdy and the dismissal of the claims against the City; however, we reverse the district court's grant of summary judgment to Pennica and Soucie and remand for further proceedings on those claims.

I.

A.

In the early-morning hours of November 27, 1991, the Durham Fire Department responded to reports of an apartment fire at the Few Gardens public-housing development in Durham, North Carolina. Responding firefighters were met with a grisly scene—the naked bodies of Doris Washington and her 13-year-old daughter, Nishonda, lying face

3

down on a bed in their apartment. Autopsies later that morning revealed that Doris and Nishonda had died before the fire started. Doris had been strangled and died from a blunt-force strike to her abdomen; Nishonda had also been strangled. Both mother and daughter showed possible signs of sexual assault. Doris had a laceration in her vagina caused by an object. And a rape kit revealed sperm in Nishonda's vagina and anus, which the state pathologist concluded had been deposited within 24 hours before the autopsy. Over the course of the next 20 years, all DNA evidence would exclude Howard as the perpetrator of either of these assaults.[1]

At the time of Doris and Nishonda's murders, Few Gardens was an economically depressed, high-crime area. Many of its residents struggled with drug abuse, including Doris. She sold drugs and allowed others to sell drugs from her home. Several gangs operated in Few Gardens, including the New York Boys. The New York Boys were known as a particularly violent gang that used teenagers to conduct much of its work because they only faced juvenile prison time if they got caught.

The Durham Police Department ("DPD") assigned Corporal Dowdy as the lead investigator on the case. Dowdy's murder investigation quickly focused on Howard, who was known by police as a nuisance around Few Gardens; he used and sold drugs and had been arrested roughly 70 times for trespassing into Few Gardens, including on the morning after the murders.

---

[1] While it was not clear at the time of trial that sperm was present in Doris as well as Nishonda, later testing revealed such evidence, as discussed below.

Seventeen-year-old Roneka Jackson was the first witness to implicate Howard. On November 30, 1991—three days after the murders—Jackson was arrested on unrelated charges and told DPD she had information to share about the murders. When Dowdy interviewed Jackson, she stated that on the night of the murders, she had overheard Howard arguing with Doris and threatening to kill Doris and her daughter. She also stated that she saw Howard and his brother Bruce leaving Doris's apartment with a television and VCR about fifteen minutes before the fire started.

The next day, DPD received a tip from an informant that drug dealers from New York or Philadelphia had murdered Doris and Nishonda because Doris owed them money. The informant stated that the drug dealers came to collect their money and raped Doris before strangling her. The informant speculated that Nishonda walked in on the attack on Doris and was killed as a result. Dowdy's superior officer referred the tip to Dowdy and informed him that it might be credible because the sexual assault was not public knowledge. But Dowdy did not follow up on what seemed to be a credible tip.[2]

Instead, over the ensuing months, Dowdy obtained several other statements from witnesses that inculpated Howard. Two neighbors said they saw Howard leaving Doris's apartment building with a TV the night of the murders. But police never discovered any physical evidence linking Howard to the murders, including the allegedly stolen TV.

---

[2] Perhaps further supporting the credibility of this tip, local newspapers reported during the murder investigation that several days before the murders, Nishonda had contacted the Department of Social Services and expressed concern for her safety and that of her mother because her mother was dealing drugs and owed money to drug dealers.

The most critical piece of witness testimony that Dowdy collected came nearly a year after the murders. On October 10, 1992, he recorded an interview with Angela Southerland, who had been arrested on other charges. During Southerland's 46-minute interview, Dowdy stopped the recording several times, such that only 10 minutes of the interview were recorded. In that recorded portion, Southerland reported that she, Howard, and Howard's brother Harvey had traveled to Doris's apartment the night of the murders to collect money or drugs that Doris owed Howard. She said that Doris didn't have the money or drugs, so Howard hit her in the face and dragged her upstairs. Howard told Southerland to leave, so she wouldn't "be around [for] what he was fixing to do." J.A. 1260.[3] Southerland stayed outside the apartment. She stated that when Howard and his brother eventually left the apartment, the brothers set a fire to avoid leaving any evidence.

Several days later, Dowdy interviewed Jackson again. After being presented with photographic lineups, Jackson identified Southerland and Harvey as the people she saw with Howard on the evening of November 26, 1991. This contradicted her original statement, in which she had identified Howard's *other* brother, Bruce, as accompanying him that night, and did not mention seeing a woman with the brothers.

On November 12, 1992, Dowdy obtained warrants to arrest Howard for the two murders and for arson. DPD arrested and charged Howard with those crimes. They also arrested and charged Harvey, but only for arson.[4] Shortly thereafter, however, Howard

---

[3] Citations to the "J.A." refer to the parties' Joint Appendix filed in this appeal.

[4] The charges against Harvey were ultimately dropped.

6

requested DNA testing of the rape kits. And the DNA evidence suggested a different, or at least more complicated, story—a DNA test of the sperm found in Nishonda's vagina and anus excluded Howard as a source.

In light of these results, the lead prosecutor, Michael Nifong, instructed Dowdy to investigate whether Nishonda had a boyfriend, and if so, to locate him. According to Dowdy and Nifong's testimony in this case, sometime prior to trial, Dowdy told Nifong that Nishonda had stayed with a boyfriend until the evening of the murders. However, Dowdy never learned the boyfriend's name, never located him, and never identified the address where Nishonda and her boyfriend were apparently staying hours before her murder. Furthermore, Dowdy's contemporaneous investigative report contains no information related to his investigation of Nishonda's boyfriend and no mention that Nishonda was staying with her boyfriend until the evening of November 26, 1991. To the contrary, Dowdy's report states that a witness told him that Nishonda returned to the apartment on November 24—several days before the murders.

B.

Howard's trial for the murders of Doris and Nishonda took place in March 1995. The witnesses for the prosecution included Jackson, Southerland, three of the victims' neighbors, several DPD officers (including Dowdy), a woman who testified she overheard Howard confess to the murders at a crowded drink house, and the Durham County Fire Marshal, who also testified that Howard made incriminating statements to him.

Unbeknownst to Howard, beginning no later than 1994 and continuing through the time of trial, Jackson had been a confidential police informant for DPD, embedded with

7

the New York Boys gang. Because Howard was unaware of Jackson's status as a confidential informant or her relationship to the New York Boys, he was unable to cross-examine her on those points at trial.

Southerland also testified during Howard's trial. After she failed to respond to questions from the prosecutor, the trial court permitted the prosecutor to play the recording of her interview. On further questioning, Southerland did not provide a straightforward answer as to whether her recorded statement was true and, at one point, denied knowing anything about the murders. She also testified that Dowdy stopped the interview multiple times and that he said "something ain't right," "[t]urn off the tape," and "come on now." J.A. 1015.

During Dowdy's testimony, he testified (contrary to his investigative report) that Nishonda had been away from Doris's apartment for almost a week before the murders and hadn't returned until the evening of November 26. He also testified that he had never investigated the case as a sexual-assault case, despite the evidence of semen in the anus of a 13-year-old girl. And Dowdy denied defense counsel's suggestion that he had fed details of the investigation to Southerland during her taped interview, explaining that the stops in the tape were due to interruptions from other officers for ten to fifteen minutes.

Howard testified in his own defense. Although he admitted to having an argument with Doris, he said the argument occurred two days before the murder and that he never threatened her during it. He conceded that he went to Few Gardens on the day of the murders to obtain drugs but explained that he did not go to Doris's apartment. And he testified that he left Few Gardens after the fires started because he had been arrested for

8

trespassing there before and didn't want to get arrested again. Howard's girlfriend also testified as an alibi witness, corroborating his story.

Ultimately, the jury convicted Howard of two counts of second-degree murder and one count of first-degree arson. He was sentenced to 80 years of imprisonment.

C.

Howard continued to maintain his innocence after his conviction. In 2009, he moved in state court for post-conviction DNA testing of the rape kits. Dale Morrill, a prosecutor in the Durham County District Attorney's office, was assigned to the motion and informed DPD about it. The court granted Howard's motion, and the rape kits were retested in December 2010.

Once again, the testing excluded Howard as the source of the sperm found in Nishonda. But the testing also revealed previously undetected sperm in her mother Doris's rape kit. The newly discovered DNA in Doris's kit also excluded Howard as the source. In addition, the testing revealed that the DNA in Doris's rape kit came from a *different* man than the one whose DNA was found in Nishonda's rape kit. And in August 2011—after a court order to further examine the DNA evidence—the sample from Doris was matched to Jermeck Jones via the FBI's Combined DNA Index System ("CODIS"). According to later witness testimony, Jones—who was 16 years old at the time of the murders—was a member of the New York Boys.

The CODIS hit presented a novel situation for DPD. According to officer testimony, Howard's case was the first time DPD had obtained a conviction and then received a post-conviction DNA match through CODIS showing that someone else may have committed

9

the crime. In late August 2011, the North Carolina State Bureau of Investigation ("SBI") contacted DPD Sergeant Scott Pennica to notify him of the CODIS hit and ask him to obtain a DNA sample from Jones for comparison with Doris's rape kit. Because Pennica joined DPD after Howard's conviction, and because of the novel nature of the situation, he spent some time getting up to speed on the original case against Howard.

Pennica learned from Morrill that Durham District Attorney Tracey Cline had decided not to pursue the CODIS hit as a criminal case. But after speaking with other DPD investigators, Pennica concluded that DPD should obtain a DNA sample from Jones. So he tasked Michele Soucie, an investigator who also had not worked at DPD during Howard's original case, with helping him to find Jones and obtain a DNA sample. Soucie prepared the search warrant to collect a DNA sample from Jones.

Meanwhile, although Howard and his counsel were notified that there had been a CODIS hit, they had not yet been informed of Jones's identity. They filed a motion to compel the State to disclose the name of the CODIS match and any information that the Durham District Attorney's Office or DPD had on the suspect. The superior court granted the motion in September 2011, ordering both DPD and the District Attorney to share with Howard's attorneys "any information" they had regarding alternative suspects, such as Jones ("2011 Order"). The order was served only on Morrill, and the parties dispute whether DPD officers ever saw it—a fact that is critical to one of Howard's claims here.

On December 14, 2011, Soucie and Pennica brought Jones in to obtain a DNA sample and interview him. During a videotaped interview, they read Jones his *Miranda* rights and explained why they were collecting his DNA. Jones immediately appeared to

10

grow agitated and made several improbable statements. When told that they were collecting his DNA as part of the investigation into Doris's murder, Jones stated he didn't even know Doris. He continued to repeat that he didn't know her or have sex with her. Later, he stated that he *did* have sex with her daughter, Nishonda, who he claimed was his girlfriend at the time—even though his DNA was only found in Doris. During the interview, Soucie assured Jones he wasn't being charged with murder, stating, "We have to follow up on a CODIS hit, because the Innocence Commission has picked up this case, okay. Because [Howard's counsel is] trying to say that, since the DNA doesn't match their guy, that he's innocent. But he's not, okay. We have witnesses that were there at the scene, okay. They've already testified. So we just have to follow up." J.A. 1829.

Jones was left alone in the interview room for several periods of time. He made several phone calls, all of which were recorded through a camera disguised as a thermostat. He spoke to an unidentified person about "the other Shonda and her mama" who used to stay in Few Gardens and asked how his name had "come up." J.A. 1819. On another call, he stated, "Yeah, because you remember we used to be over at Shonda house." J.A. 1822. At one point, Jones said that he did not want to "rat on anybody" and that DPD wouldn't learn anything "without [his] attorney." J.A. 1833, 1835. These statements were incriminating because they suggested he *did* know Doris, had been to her apartment, and had knowledge of the murders. But Pennica and Soucie claim that neither of them was listening to Jones when he was in the room alone and never realized they had recorded him making these statements.

11

After the interview, Soucie wrote a short report and submitted all relevant documents and a copy of the video of Jones's interview to the DPD records department. Neither Pennica nor Soucie ever sent the report or a copy of the interview to Morrill or anyone else at the District Attorney's Office, despite the 2011 Order requiring disclosure of this information to Howard.

In June 2012, SBI reported to Soucie that the DNA that they had collected from Jones matched the DNA recovered from Doris's rape kit. Howard would learn about the match soon after, but he did not learn about the interview with Jones—or the incriminating statements contained therein—until 2016. In the meantime, in 2014, he filed a motion for a new trial based on the DNA evidence. The superior court granted the motion that year, but the North Carolina Court of Appeals vacated that order in 2016 and remanded the case for an evidentiary hearing. *State v. Howard*, 783 S.E.2d 786, 798 (N.C. Ct. App. 2016).

At the evidentiary hearing, Howard called Jones to testify. But when Howard asked Jones about the murders and if he had sexually assaulted Doris, Jones invoked his Fifth Amendment right against self-incrimination. Nevertheless, following the hearing, in December 2016, the superior court again vacated Howard's conviction and ordered a new trial. The State thereafter dismissed all charges and elected not to retry Howard. After more than two decades in prison, Howard was released. And in 2021, North Carolina Governor Roy Cooper granted Howard a Pardon of Innocence.

## D.

Howard then filed this action against the City of Durham, Dowdy, Pennica, and Soucie for violating his federal and state constitutional rights, among other state-law

12

claims. After discovery, the defendants moved for summary judgment. Howard presented deposition testimony from several of the State's witnesses from his criminal trial—including two of Doris's neighbors and the witness who had testified she overheard Howard confess to the murders at a drink house—each of whom testified generally that Dowdy falsified or misrepresented their statements to him in order to implicate Howard in the murders.

The district court dismissed Howard's claims against the City for having an unconstitutional policy or custom of failing to disclose *Brady* evidence regarding police informants like Jackson. Citing *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the court reasoned that "[e]ven if the DPD's Organized Crime Division's handling of informants constituted a policy, Howard has not shown that a final policymaker knew of or ratified it." *Howard v. City of Durham*, 487 F. Supp. 3d 377, 439 (M.D.N.C. 2020). It also concluded that Howard failed to show the City had a persistent and widespread practice of failing to disclose *Brady* evidence. *Id.* at 440. The court also dismissed Howard's claims against Pennica and Soucie for suppressing Jones's interview, finding that there was no evidence that either officer acted in bad faith. *Id.* at 434–35.

But the district court allowed three of Howard's claims to proceed to trial, all against Dowdy: that Dowdy fabricated statements from Southerland by feeding her information during her taped interview; that Dowdy fabricated evidence regarding Nishonda's boyfriend and her whereabouts prior to her murder; and that Dowdy suppressed evidence that, at the time of trial, Jackson was a confidential informant for DPD. *Id.* at 412, 416, 420.

13

The jury trial took place over nearly four weeks in November 2021. At the end of the trial, the jury found Dowdy liable for the first two of Howard's three remaining claims and awarded Howard an even $6 million. After the trial, the Durham City Council voted not to indemnify Dowdy.

Howard timely appealed the court's summary judgment order dismissing the City of Durham, Pennica, and Soucie, as well as the jury's damages award. Dowdy cross-appealed the jury verdict, challenging the admission of evidence regarding Governor Cooper's Pardon of Innocence and the court's refusal to strike a juror for cause based on her statements during voir dire.

## II.

This Court reviews the district court's grant of summary judgment de novo, construing "all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023). Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

We review the district court's "application of the Federal Rules of Evidence . . . under an abuse-of-discretion standard" and "its interpretations of such rules de novo." *Ward v. AutoZoners, LLC*, 958 F.3d 254, 273 (4th Cir. 2020). Any abuse of discretion is reviewed for harmless error. *Id.* A district court's refusal to strike a juror for cause will be overturned only if there is manifest abuse of discretion. *Poynter ex rel. Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989).

14

III.

Howard raises several challenges on appeal. First, he argues that the district court erred in granting summary judgment to Officers Pennica and Soucie on his 42 U.S.C. § 1983 due process claim for intentionally suppressing exculpatory evidence during Howard's post-conviction innocence proceedings. Next, he argues the court erred by granting summary judgment to the City on his *Monell* claim for having an official policy or custom of withholding *Brady* evidence by keeping secret the identities of confidential informants like Jackson. And third, he argues that the court abused its discretion under Federal Rule of Procedure 404(b) in allowing the introduction at trial of various bad-act evidence, which he contends lowered the jury's ultimate damages award. For this last error, Howard asks that we set aside the jury verdict and remand for a damages-only trial. We consider each issue in turn.

A.

We first consider the district court's grant of summary judgment to Pennica and Soucie. Howard contends that both DPD officers violated his due process right to post-conviction evidence owed to him under North Carolina law by suppressing in bad faith evidence of their video interview with Jones in 2011, where Jones made several incriminating statements. Although Pennica and Soucie do not dispute that Howard's claim arises under the Due Process Clause, they argue that he cannot show they acted in bad faith. We begin with the relevant legal standards.

Under *Brady v. Maryland* and this Court's decision in *Barbee v. Warden, Maryland Penitentiary*, a police officer's bad-faith failure to disclose exculpatory evidence violates

15

the Due Process Clause. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (establishing duty for prosecutors); *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846–47 (4th Cir. 1964) (extending *Brady* duty to police officers); *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 & n.6 (4th Cir. 2014) (explaining bad-faith standard for police). But *Brady*'s duty of disclosure does not extend post-conviction; rather, a convicted individual's right to due process "must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief." *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 69 (2009).

Nonetheless, a convicted individual may "have a liberty interest in demonstrating his innocence with new evidence under state law." *Id.* at 68. When a state enacts a law granting convicted individuals a right to evidence and a procedure for accessing such evidence, that "state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right." *Id.* (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981)). And in considering a due process claim challenging state post-conviction procedures, courts must ask whether the state procedure "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *Id.* at 69 (quoting *Medina v. California*, 505 U.S. 437, 446 (1992)).

In *District Attorney's Office for the Third Judicial District v. Osborne*, the Supreme Court held that there is no freestanding substantive due process right to DNA evidence. *Id.* at 72. Nevertheless, it did identify a due process liberty interest grounded in Alaska's general post-conviction relief statutes that made evidence from DNA testing available to

16

defendants. *See id.* at 70 (explaining that the State "provides for discovery in postconviction proceedings"); *see also* Alaska Stat. § 12.72.010 (2008) (allowing a convicted individual to move for post-conviction relief based on new evidence of material facts). Based on those statutes, the Court held that Alaska provided the defendant a "substantive right to be released on a sufficiently compelling showing of new evidence that establishes innocence." *Osborne*, 557 U.S. at 70.

Here, Howard claims that Pennica and Soucie violated his due process rights by suppressing exculpatory evidence that a state court ordered to be disclosed under North Carolina's post-conviction relief statutes. As such, we must consider whether North Carolina law created a liberty interest for Howard to demonstrate his innocence post-conviction, and whether there is a genuine dispute of material fact as to whether Pennica and Soucie violated that interest by intentionally withholding evidence of the Jones interview.

1.

North Carolina has created a constitutionally protected right to demonstrate one's innocence post-conviction with new evidence and DNA testing. *See* N.C. Gen. Stat. §§ 15A-269, 15A-1415(c). Under N.C. Gen. Stat. § 15A-269, a defendant may make a post-conviction motion for DNA testing and comparison to the CODIS database. When testing is "favorable to the defendant," the court must "enter any order that serves the interests of justice." *Id.* § 15A-270(c). Additionally, under N.C. Gen. Stat. § 15A-1415(c),

17

a defendant may make a motion for appropriate relief[5] on the grounds of newly discovered evidence. In those post-conviction proceedings, if the defendant is represented by counsel, the State "shall make available to the defendant's counsel the complete files of all law enforcement" involved in the investigation. *Id.* § 15A-1415(f). As a whole, then, North Carolina's procedures are materially indistinguishable from those that gave rise to a liberty interest in *Osborne*. *Cf. Newton v. City of New York*, 779 F.3d 140, 147, 151 (2d Cir. 2015) (applying *Osborne* and holding that city's inadequate evidence-management system deprived plaintiff of the liberty interests owed to him under New York's post-conviction relief statutes).

Let us not forget, too, that this state-created right can "beget yet other rights to procedures essential to the realization of the parent right." *Osborne*, 557 U.S. at 68 (quoting *Dumschat*, 452 U.S. at 463). And although a police officer generally does not owe a duty to disclose exculpatory evidence post-conviction, in this case, such a duty became essential to realizing Howard's rights to demonstrate his innocence under state-created procedures. Both by statute and by court order, Howard had a right to access DPD's files. *See* J.A. 1750 (2011 Order requiring that DPD "share with counsel for Mr. Howard any information it possesses about the man whose DNA was detected in Doris W.'s sexual assault kit"); N.C. Gen. Stat. § 15A-1415(f). And it would transgress "fundamental fairness" if a police officer could willfully ignore North Carolina's state-created procedures and a court order by

---

[5] A "motion for appropriate relief" is the vehicle for seeking state habeas relief in North Carolina. *Hayes v. York*, 311 F.3d 321, 324 (4th Cir. 2002).

18

withholding evidence to which an inmate seeking post-conviction relief was entitled. *Medina*, 505 U.S. at 448. As such, Howard's rights are entitled to protection under the Due Process Clause "to insure that [this] state-created right is not arbitrarily abrogated." *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974).

2.

To determine whether a plaintiff has stated a claim against an officer for suppressing exculpatory evidence due under state law post-conviction, we employ the same standard as in the pre-conviction context. Howard must ultimately prove that "(1) the evidence at issue was favorable to him; (2) the officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Burgess v. Goldstein*, 997 F.3d 541, 550 (4th Cir. 2021); *see also Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019) (holding "there can be no reasonable dispute . . . that an individual has a constitutional right not to be deprived of liberty as a result of the intentional, bad-faith withholding of evidence by an investigating officer").

In this case, the first and third prongs of the analysis are undisputed. As the district court noted, Pennica and Soucie do not dispute that the video "recording of Jones's interview and their related notes contain exculpatory information whose disclosure was required by" the 2011 Order. *Howard*, 487 F. Supp. 3d at 432. Nor do they dispute that this evidence was suppressed or that prejudice resulted from that suppression.

19

The only question before us, therefore, is whether this suppression was undertaken in bad faith.[6] To succeed on this prong, Howard must present sufficient evidence of bad faith "that would negate any negligent or innocent explanation for the actions on the part of the police." *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (en banc) (Wilkinson, J., concurring in the judgment). Here, the key factual dispute is whether Pennica and Soucie knew about the 2011 Order. That's because if they *did* know about the order, a reasonable factfinder could conclude that intentionally withholding the interview notwithstanding the order would be in bad faith. The district court was unconvinced that the officers were on notice of it, concluding that the "record strongly indicates that neither Pennica nor Soucie

---

[6] Pennica and Soucie briefly argue that even if they violated Howard's constitutional rights, the officers are nonetheless protected by qualified immunity. Qualified immunity, however, will only shield them if their conduct did not violate clearly established constitutional rights of which a reasonable officer would have known. *Ray v. Roane*, 948 F.3d 222, 228 (4th Cir. 2020).

Defendants frame the issue as whether a reasonable officer *without knowledge of the 2011 Order* would have known they must disclose exculpatory evidence. But this framing is untethered from the constitutional violation at issue. If the officers weren't aware of the 2011 Order, they did not act intentionally and in bad faith, and there is no constitutional violation and no need to rely on qualified immunity. Instead, the question is whether a reasonable officer would have known they could not *intentionally and in bad faith* withhold exculpatory evidence they knew to be due to a defendant under state law.

With the question properly framed, we may quickly resolve the inquiry. As this Court held in *Gilliam v. Sealey*, "it was clearly established in 1983 that an individual has a constitutional right not to be deprived of liberty as a result of the intentional, bad-faith withholding of evidence by an investigating officer." 932 F.3d at 241. Moreover, in 2009, the Supreme Court held that states could create liberty interests for convicted individuals to "demonstrat[e their] innocence with new evidence under state law." *Osborne*, 557 U.S. at 68. Thus, no reasonable officer in 2011 could conclude that intentionally ignoring a court order to disclose evidence, even if in a post-conviction setting, was not a constitutional violation clearly established by law.

20

was aware of any obligation to provide their notes and the recording in a closed case to the [District Attorney]." *Howard*, 487 F. Supp. 3d at 435. But this matter presents a genuine dispute of material fact that cannot be resolved on summary judgment.

To be sure, Pennica and Soucie maintain they never learned about the 2011 Order or its obligations. This position is supported in some ways by the record. As the parties agree, Howard's post-conviction counsel never served the order on DPD. And because the District Attorney had stated she would not pursue charges against Jones for the murders, there was no open case in the usual sense; if there had been, that might have triggered Pennica and Soucie to handle the evidence differently.[7]

But Rule 56 demands that we "avoid simply accepting [Pennica and Soucie's] self-serving statements and . . . consider *all* contradictory evidence." *Knibbs v. Momphard*, 30 F.4th 200, 216 (4th Cir. 2022) (quoting *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022)). In that vein, other portions of the record suggest that Pennica and Soucie understood both the significance of their interview with Jones and their obligation under the 2011 Order to disclose the recording and notes related to that interview.

To start, Pennica testified that the DNA match to Jones years after Howard's conviction was "totally different" from anything DPD had experienced before. J.A. 1690. According to Pennica, this was the first time DPD had obtained a conviction and then received post-conviction DNA evidence through CODIS showing that someone else may

---

[7] Pennica and Soucie generally acknowledged that when the District Attorney had an open case, DPD officers would send over any new investigative material to the District Attorney's Office, which would ultimately distribute it to defense counsel.

have committed the crime. Understandably, then, Pennica got his bearings on the case and spent a good bit of time learning about it, including reading the trial transcript, before proceeding with Jones's interview. DPD even later praised him for "recogniz[ing] the potential risk to [DPD] during an Innocence Commission investigation." J.A. 1716. And ultimately, when Pennica and Soucie interviewed Jones, Jones made several incriminating statements by denying any knowledge of who Doris was and then claiming to have had sex only with her daughter, even though his DNA was found only in Doris.[8] In this context, it is remarkable that a police officer would believe he could simply file away such evidence, all while Howard remained imprisoned and was actively pursuing innocence proceedings in state court.

Additionally, by filing the only copy of Jones's interview with the DPD Evidence Unit, Pennica and Soucie may have violated an internal DPD policy regarding interview room procedures, which required that DPD officers distribute a copy of a taped interview to three places: (1) "the [DPD] Property and Evidence Unit to be stored as evidence;" (2) "the appropriate prosecutor's office after criminal charges have been filed;" and (3) "the lead investigator for inclusion in the criminal investigative file." J.A. 1866. Even assuming the second requirement was not applicable in this context, the third requirement arguably was—but Pennica and Soucie did not comply with it. *See Brooks v. Johnson*, 924 F.3d 104,

---

[8] That's not to mention that Jones also made several incriminating statements when he was alone in the interview room. Both Pennica and Soucie claim they never heard those statements, but there is no other evidence in the record apart from their own self-serving testimony to support that assertion. Along with the other disputed issues of material fact here, a jury may ultimately choose whether to credit their testimony on that issue.

22

122 (4th Cir. 2019) (holding, in the excessive-force context, that "whether an officer has complied with or, alternatively, violated a relevant use-of-force policy, while not dispositive, is highly relevant [to their subjective intent]").

And there is more. Not only should a reasonable officer have recognized an obligation to do more, but a jury could find that Pennica and Soucie *did know* they had such an obligation because the jury could conclude that Morrill told Pennica and Soucie about the 2011 Order.

To review, Morrill was the prosecutor assigned to Howard's innocence proceedings and a recipient of the 2011 Order. Morrill regularly worked with DPD, and in this case, his contact was Pennica. And though Morrill testified at his deposition that he could not specifically remember, eight years later, whether he served the order on Pennica, he also testified that it was his practice to notify DPD of any court-ordered disclosure obligations.

As Morrill testified—and indeed, as his actions bear out—he consistently conveyed to SBI and DPD their obligations in this case. Critically, Morrill testified that it was generally his practice to ensure that any court order he received requiring DPD or another agency to do something was communicated to that agency. He further explained that even if he was somehow "on autopilot" in this case, his actions appear to have been "happening in accordance with what was required." J.A. 1644. Indeed, in this case, he consistently communicated with SBI and DPD about evidence and testing, beginning with Howard's initial motion for appropriate relief. And even if Morrill couldn't recall his specific actions as to the 2011 Order, evidence indicates he at least complied with parts of it, by sharing

23

files and Jones's name with Howard's counsel, and even meeting with Howard's counsel, all within days after the order.

Nonetheless, Pennica and Soucie argue that Morrill's testimony regarding his general practice of sharing orders with relevant agencies is insufficient to demonstrate that he did so in this case. At this stage of the proceedings, we disagree. This evidence is admissible under Federal Rule of Evidence 406, which provides that "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." Such evidence can be "highly persuasive as proof of conduct on a particular occasion." Fed. R. Evid. 406 advisory committee's note to 1972 proposed rules. And here, alongside the other evidence noted above, it creates a genuine dispute of material fact as to whether Pennica and Soucie knew about the 2011 Order and intentionally violated it.

To support their argument that Morrill's testimony doesn't satisfy Rule 406, Pennica and Soucie largely rely on our decision in *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494 (4th Cir. 1977). In *Wilson*, we opined that a "habit or pattern of conduct is never to be lightly established, and evidence of examples, for purpose of establishing such habit, is to be carefully scrutinized before admission." *Id.* at 511. But *Wilson* differs significantly from this case. There, the plaintiff tried to establish that defense counsel had a "pattern of stone walling," based on counsel's conduct in three previous cases. *Id.* at 510. But we explained that to establish habit solely by use of prior examples, those examples had to be "numerous enough" and "sufficiently regular." *Id.* at 511.

24

Habit evidence, however, can also be established by a witness's direct testimony of his general practice. This Court has found such evidence to be sufficient proof that a practice occurred on a particular occasion. *See Bouchat v. Balt. Ravens, Inc.*, 241 F.3d 350, 354 (4th Cir. 2001) (noting that jury was entitled to credit testimony of an office's regular practice of forwarding faxes to find that a fax was forwarded on a specific occasion); *Harold v. Cendo*, 131 F.3d 134, at *8 (4th Cir. Nov. 26, 1997) (orally argued, but unpublished, per curiam table decision) (holding that testimony could be admitted of doctor's custom of advising surgeons not to operate on injuries when patient has a head injury even though doctor could not remember so advising in specific instance).

Accordingly, "[c]ourts may accept Rule 406 evidence at the summary judgment stage as providing an inference that a routine practice was actually carried out." *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261–62 (10th Cir. 2012); *see, e.g.*, *Doe ex rel. Rothert v. Chapman*, 30 F.4th 766, 772 (8th Cir. 2022) (affirming denial of summary judgment because the judge's testimony as to his standard practice regarding offering pre-filing directions was evidence he acted in accordance with that practice), *vacated on other grounds*, 143 S. Ct. 857 (2023); *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 161 (2d Cir. 2012) (reversing summary judgment where analyst was "unable to recall specifically" whether she reviewed an opinion letter endorsing stock, but "there was evidence that she actively reviewed such letters as a matter of practice in deciding whether to recommend certain stocks" and explaining that, "[a]t this stage of the proceedings, [the witness's] testimony is enough" for a jury to "infer that she actually reviewed and relied on the relevant statements in the documents"); *Morris v. Travelers Indem. Co. of Am.*, 518 F.3d

25

755, 761 (10th Cir. 2008) (reversing summary judgment and holding that "[a]n affidavit from an [insurance] agent that it was his usual practice to explain the various . . . coverage options constitutes relevant evidence that his conduct on the occasion he met with the insured was in conformity with that routine practice").

Based on the evidence presented at summary judgment, a reasonable juror could conclude that Morrill had a regular practice of notifying DPD of its court-ordered disclosure obligations, and could infer based on that practice that he notified Pennica about the 2011 Order. As such, the jury could find that by not turning over the video of an alternative suspect making incriminating statements or their notes related to that interview, Pennica and Soucie intentionally hid evidence from Howard in his innocence proceedings—evidence that cast serious doubts on his conviction and, potentially, on DPD's underlying investigation. Of course, a reasonable juror could also conclude that on this occasion, Morrill did not follow his general practice of informing DPD about its court obligations and did not inform the officers of their duties here, as Pennica and Soucie claim—or even that Morrill had no such general practice. But the weight to give this competing testimony is a credibility issue that should be left to the jury. *See United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994). Thus, we reverse the district court's dismissal of the claims against Pennica and Soucie at summary judgment and remand for further proceedings.

## B.

Howard next argues that the district court erred in granting summary judgment to the City on his *Monell* claim. He contends that DPD had an express policy requiring that

26

*Brady* material regarding confidential informants be kept secret, in violation of its constitutional obligations. In the alternative, he argues that DPD's practice of suppressing information regarding confidential informants was persistent and widespread enough to qualify as a custom under *Monell*. This policy or custom, Howard continues, led to Dowdy's failure to disclose evidence of Jackson's status as a paid police informant and deprived Howard of the right to a fair trial. Howard argues that, without evidence that Jackson was an informant with deep ties to the New York Boys, he was unable to demonstrate her motive to falsely implicate him in the murders and divert attention from the true perpetrators. Ultimately, however, we are not convinced that such a violation can be laid at the City's doorstep.

Importantly, "municipal liability attaches only when the decision maker is the municipality's governing body, a municipal agency, or an official possessing final authority to create official policy." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999). This policymaker involvement is required because, as the Supreme Court has made clear, *Monell* liability is not respondeat superior liability under a different moniker. *Monell*, 436 U.S. at 691. Municipalities are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986). So, to hold a municipality liable for a constitutional violation under *Monell*, a plaintiff must prove "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). The policy or custom may be expressed in one of several forms:

27

> (1) [T]hrough an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)). Howard seeks to establish a policy or custom through either the first or fourth method.

To succeed under the first method, Howard must point to an "express policy," that is, "formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur*, 475 U.S. at 480–81. To prove a custom or practice using the fourth method, he must show that "a pattern of comparable practices has become actually or constructively known to responsible policymakers." *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987). In other words, a "custom or usage" can support *Monell* liability "only if its continued existence can be laid to the fault of municipal policy-makers, and a sufficient causal connection between the 'municipal custom and usage' and the specific violation can then be established." *Randall v. Prince George's County*, 302 F.3d 188, 210 (4th Cir. 2002) (quoting *Spell*, 824 F.2d at 1390).

To be liable, "(1) the municipality must have 'actual or constructive knowledge' of the custom and usage by its responsible policymakers, and (2) there must be a failure by those policymakers, 'as a matter of specific intent or deliberate indifference,' to correct or terminate the improper custom and usage." *Id.* (quoting *Spell*, 824 F.2d at 1391).

28

"Prevailing under such a theory is no easy task." *Owens*, 767 F.3d at 402. That's because "[s]poradic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *Id.* at 403 (quoting *Spell*, 824 F.2d at 1387).

The alleged constitutional violation here is DPD's failure to disclose Jackson's role as a confidential informant. When Jackson testified at trial, she was embedded with the New York Boys—the gang that Jones worked for, and that Howard contends was responsible for the murders of Doris and Nishonda. Defendants' counsel conceded below that Jackson's status as a paid confidential informant embedded with the New York Boys was *Brady* material. *See Banks v. Dretke*, 540 U.S. 668, 703 (2004) (holding that suppression of prosecution witness's police-informant status violated *Brady*). But to hold the City liable for this *Brady* violation, Howard must show that the City was the moving force behind the violation using one of the methods discussed above.

First, seeking to establish that the City had an express policy to violate *Brady* in this way, Howard relies on the declaration of DPD Captain Joseph Kelly. Kelly described how DPD's Organized Crime Division handles the identities of confidential informants, explaining that "confidential informants' identities are kept secret and known only to the registering officers working with them (and possibly the registering officers' partners in limited, need-to-know circumstances). Confidential informants' identities are not revealed to other officers, whether in the [Organized Crime Division] or other DPD divisions." J.A. 445–46. Kelly further opined that it would be impractical to compare informants' identities with prosecution witness lists. Consistent with this purported policy, Jackson's police

29

handler testified she kept Jackson's informant status secret and directed Jackson not to tell others about it.

But even accepting that withholding *Brady* evidence of confidential-informant status was an express policy of DPD's Organized Crime Division,[9] there is no evidence that it was an express policy of *the City*. Instead, Howard has identified a set of practices followed by the captain of one police department. The creator of these practices is unknown, and there is no evidence regarding whether the police chief or someone with higher authority ever approved of the policy. Notably, "[w]hether an official has sufficient policymaking authority is a question of state law." *Lytle*, 326 F.3d at 472 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988)). "The examination of state law allows for consideration of whether policymaking authority in fact rests where state law has placed it." *Id.* (citing *Crowley v. Prince George's County*, 890 F.2d 683, 686 (4th Cir. 1989)). And critically to this case, this Court has already rejected the idea that a police captain can set policies for a city, absent any state law granting such authority, noting that a "police department has multiple captains and multiple lieutenants, and it is far-fetched to assert

---

[9] Defendants argue that this policy of secrecy was necessary for the safety of their informants but that it would necessarily yield to their *Brady* obligations. They rely on the testimony of DPD Captain Paul Martin, who oversaw the Organized Crime Division at the time of Howard's trial and who testified that detectives were expected to disclose the confidential-informant status of any testifying witness. Nonetheless, at the summary-judgment stage where we must view the facts in the light most favorable to Howard, *Bandy*, 59 F.4th at 709, there remains a dispute as to whether the policy was, in fact, to place *Brady* obligations over safety concerns. Certainly, the City did not do so in Howard's case, where he was never informed about Jackson.

30

that each of these individuals has the power to be a final policymaker for the city." *Id.* at 472–73.

Howard argues that requiring proof of policy approval by a final policymaker conflates the proof required to show an express policy with that required to demonstrate the second type of *Monell* liability, a custom or policy shown through the decisions of a person with final policymaking authority. But he misses a foundational principle of *Monell* liability—that municipalities are liable only for "acts which *the municipality* has officially sanctioned or ordered." *Pembaur*, 475 U.S. at 480 (emphasis added). On this point, it's simple: he cannot show that the policy described by Captain Kelly was an official policy of the City because he's offered no proof it was ever approved of by the City. And in any event, this Court rejected the same arguments Howard now raises in *Lytle v. Doyle*, where we held that a police captain's memorandum containing "a fixed plan for dealing with protesters" could not "constitute an official written policy of the City because it was never approved by the City Manager" or even the police chief. 326 F.3d at 471; *see id.* at 471–72.

In the alternative, Howard argues that DPD had a persistent and widespread practice of failing to disclose the status of confidential informants who were testifying in cases and that this practice is sufficient to satisfy the fourth method for showing *Monell* liability. But fatally to his claim, Howard offers evidence of only a single incident of unconstitutional

31

activity: the incident in this very case.[10] And "proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom." *Semple*, 195 F.3d at 713–14.

Nor is it sufficient that, as Howard argues, the Organized Crime Division's custom of keeping confidential informants secret dated back to at least 1990. Even if the City was aware of that custom, to be liable under *Monell*, the City must have had knowledge of the *unconstitutional* behavior, not simply DPD's general secrecy regarding confidential informants.

In sum, we affirm the district court's decision granting summary judgment to the City of Durham.

## C.

Howard's last claim on appeal stems from the trial itself. Although he received a $6 million jury verdict, he asks this Court to vacate that verdict and order a new trial on

---

[10] Howard also identifies two witness statements that Jackson gave in another case involving the New York Boys during the time she was a confidential informant. In an affidavit, Howard's counsel stated that she reviewed the investigative file for that case and "did not see any reference to . . . Jackson being a DPD informant in those files." J.A. 1871. From this, Howard infers that DPD did not disclose Jackson's status in that case, either. But there's no evidence that Jackson testified in that case. And even if we assume there was an unconstitutional failure to disclose in that case as well as in this one, *and* that these two isolated events were sufficient to establish a custom that DPD failed to disclose *Brady* evidence regarding confidential informants, Howard presented no evidence that a policymaker was "actually or constructively" aware of that custom, such that we could consider the City to have condoned it. *See Spell*, 824 F.2d at 1391–95 (finding that municipality condoned custom of using excessive force against detainees based on many witnesses describing police practice of encouraging excessive force, including evidence that the police chief himself advocated such misconduct).

32

damages only, arguing that the verdict would have been higher if not for Dowdy's introduction of various improper character evidence about Howard. Howard challenges four categories of evidence: the nature and extent of his drug use and drug dealing, his prior arrests for trespassing into public housing, his sexual relationships with a witness (Southerland) and another woman, and instances where he had been a victim of gun violence. Howard argues that Dowdy used this evidence to attack his character and suggest to the jury that it should either ignore the violation of Howard's constitutional rights or award him lower damages. We conclude, however, that Howard cannot show an abuse of discretion by the district court in permitting the introduction of this evidence.

We begin with the first two categories of challenged evidence: Howard's drug use and dealing, and his prior arrests for trespass. Federal Rule of Evidence 404(b)(1) prohibits "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But such evidence "may be admissible for another purpose," such as proving motive, opportunity, intent, or identity. Fed. R. Evid. 404(b)(2). We employ a four-part test to assess the admissibility of other-act evidence: "(1) the prior-act evidence must be relevant to an issue other than character, such as intent; (2) it must be necessary to prove [or disprove] an element of the [claim]; (3) it must be reliable; and (4) its probative value must not be substantially outweighed by its prejudicial nature." *Smith v. Balt. City Police Dep't*, 840 F.3d 193, 201 (4th Cir.), *as amended* (Nov. 1, 2016) (quoting *United States v. Garcia-Lagunas*, 835 F.3d 479, 493 (4th Cir. 2016)).

Other-act evidence that is "intrinsic" to the case—or here, to the underlying criminal case—falls outside the scope of Rule 404(b)(1)'s exclusion. *See United States v. Denton*, 944 F.3d 170, 185–86 (4th Cir. 2019) (stating, in a criminal case, that "Rule 404(b) only excludes bad acts evidence that is extrinsic to the charged offense," and that "[a]cts that are intrinsic to the charged offense . . . 'do not fall under Rule 404(b)'s limitations on admissible evidence'" (quoting *United States v. Chin*, 83 F.3d 83, 87–88 (4th Cir. 1996))). "Bad acts are intrinsic to the charged offense 'when they are inextricably intertwined'" with the offense, are "essential 'to the story of the crime,'" or provide "context to the charged offense." *Id.* (first quoting *Chin*, 83 F.3d at 88; and then quoting *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007)).

To support his contention that the evidence in question was inadmissible under Rule 404(b), Howard draws on two excessive-force cases where we vacated verdicts for police officers based on improper bad-act evidence about the plaintiff that the officers introduced at trial. But in both cases, the bad-act evidence was irrelevant to whether the police used excessive force during the plaintiffs' arrests, *see Kopf v. Skyrm*, 993 F.2d 374, 380 (4th Cir. 1993) ("[Plaintiff]'s guilt of the pizza store robbery is simply not relevant to the excessive force inquiry."), and irrelevant to what damages the plaintiffs suffered from those arrests, *Smith*, 840 F.3d at 203 (rejecting argument that previous arrests were relevant to the source of plaintiff's damages where there was no evidence that those arrests "were of a similar nature to the case at hand").

Here, however, much of the challenged evidence is intrinsic to Howard's underlying criminal case, making it impossible to tell "the story of the [murder investigation]" and his

34

conviction without introducing that evidence. *Denton*, 944 F.3d at 186. That's not to say Howard's innocence or guilt was the ultimate question confronting the jury. *See infra* Part IV.A. But the story of the crime was necessary context for the jury to determine whether Dowdy violated Howard's constitutional rights during his investigation of that crime. And, indeed, when arguing Howard's motions to exclude certain evidence, Howard's counsel acknowledged the fact that such evidence would be introduced: "[A] lot of evidence—you know, prior-bad-acts-type evidence is necessary to come in, and . . . the jury is going to have to hear because of the circumstances of this case, about [Howard's] drug use, his drug addiction, his prior trespassing—a number of things are going to come in." J.A. 2334. Notably, too, Howard's civil case in chief introduced many of these items in the first instance.

Indeed, Howard's drug use was key to both parties' theories of the criminal case. The prosecution argued that Howard murdered Doris because she didn't have the money or drugs that she was holding for him. For his part, Howard and his alibi witness testified that he was getting drugs at a neighbor's house when he saw the fire at Doris's apartment. In short, the drug-related evidence was intrinsic to Dowdy's investigation of the murders, and although the potential for prejudice may have been high, the district court did not abuse its discretion in concluding that such prejudice did not substantially outweigh the strong probative weight of the evidence.

Similarly, evidence of Howard's prior arrests in Few Gardens was also admissible. As the district court explained, such evidence showed Howard's "frequent presence in Few Gardens [which was] relevant to proving identity, including by those trial witnesses who

35

claimed to recognize him, as well as opportunity, among other things." *Howard v. City of Durham*, No. 1:17CV477, 2021 WL 5086379, at *26 (M.D.N.C. Nov. 2, 2021). Thus, it was not an abuse of discretion to admit that evidence. *See* Fed. R. Evid. 404(b)(2) (noting that evidence of prior crimes may be admissible for proving, *inter alia*, opportunity and identity).

We also find no abuse of discretion in allowing the introduction of evidence about Howard's relationships. Howard opened the door to some of this evidence in his own direct testimony regarding his damages, where he mentioned that he had a son with a woman other than his wife. And the evidence regarding a sexual encounter between Howard and Southerland was admissible because it related to the credibility of a key witness in the underlying criminal case. *See United States v. Turner*, 198 F.3d 425, 429 n.2 (4th Cir. 1999).

Finally, we conclude that the district court did not abuse its discretion in permitting evidence of Howard's previous gunshot injuries. As the court found, such evidence was relevant in assessing the potential causes of his damages.

Specifically, Howard claimed damages for more than two decades of wrongful incarceration. To that end, he presented testimony from a psychiatrist, who opined that Howard suffered post-traumatic stress disorder because of his wrongful incarceration. But in considering Howard's damages, the psychiatrist also examined other sources of trauma in his life, including various times he had been ambushed and shot. She testified that based on her review of his hospital records for one of those pre-incarceration shootings, Howard

revealed some early symptoms consistent with PTSD. Such evidence, then, was admissible as it related to the possible causes of his damages.

And once again, *Smith*—where we held that the district court erred in allowing evidence of past arrests as an alternative cause of the plaintiff's damages—is not on point with Howard's claims here. In *Smith*, the plaintiff's damages were limited; she sought damages for her emotional distress arising out of the particular arrest in question. *Smith*, 840 F.3d at 203. In contrast, however, where a plaintiff claims a "generally disabling long-term trauma"—as Howard does—there is more probative value in "explor[ing] other events that may have contributed to the individual's loss," like other sources of PTSD. *Barber v. City of Chicago*, 725 F.3d 702, 713 (7th Cir. 2013).

Importantly, moreover, the potential prejudice that could arise from such evidence—that a jury might infer criminality or violence on the part of Howard for being the victim of gun violence—was mitigated by a limiting instruction. J.A. 3557–58 (instructing the jury that Howard was the *victim* in the shootings and that the jury should not consider it as evidence of his character, propensity for criminal activity, or that he had anything to do with the crimes against Doris and Nishonda); *see Smith*, 840 F.3d at 203.

Howard also argues that, even if we find this evidence to have been properly admitted, defense counsel employed it for an improper purpose in his closing argument when he said that Howard "admits that he went looking for the New York Boys, that he got in numerous altercations with them. He admits he was ambushed, shot on five different occasions, shot a total of eleven times. Those are decisions that Mr. Howard made as far as how he was going to live his life." J.A. 3365. Defense counsel then asked the jury, if it

37

was "decid[ing] how much money to award Mr. Howard," "what is the evidence of how [Howard] was living his life?" J.A. 3365–66. At that point, Howard objected, and the district court sustained his objection and told defense counsel to move on.

Dowdy argues that his counsel's argument was not improper because it merely repeated a similar theme from Howard's own arguments—that "[b]efore he was wrongfully convicted, [Howard] had a tough time keeping his life together." J.A. 2625. Dowdy further points to the jury instructions, which instructed the jury to award Howard damages for "loss of enjoyment of life." J.A. 3567. Accordingly, Dowdy posits, it was not improper for his counsel to point out that Howard "lacked many of the usual keys to 'enjoyment of life' before he went to prison." Response Br. at 55.

But defense counsel crossed a line to the extent his arguments insinuated that Howard's damages might be lower because of who he was as a person. Even though the jury might consider what effects an injury has on the enjoyment of one's life, *see French v. Wal-Mart Stores, Inc.*, 188 F.3d 501, at *8 (4th Cir. 1999) (orally argued, but unpublished, per curiam table decision), we must be cognizant of the context at play in civil rights actions, which "often pit unsympathetic plaintiffs . . . against the guardians of the community's safety," *Barber*, 725 F.3d at 714 (quoting *Llaguno v. Mingey*, 763 F.2d 1560, 1570 (7th Cir. 1985) (en banc)). In such cases, improper arguments can "provide[] powerful ammunition to support a jury argument that [the plaintiff] is a despicable human being who should not be permitted to recover from the angelic police officers being wrongfully sued." *Id.* at 717.

38

Nonetheless, the district court *sustained* Howard's objection to defense counsel's argument. Howard posits that the court should have done more by either striking the argument, telling the jury to disregard it, or issuing a limiting instruction on bad-act evidence. But critically, Howard never asked the court for such remedies at the time. So, we review the court's failure to do more, sua sponte, for fundamental error. *See In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014) ("When a party in a civil case fails to raise an argument in the lower court and instead raises it for the first time before us, we may reverse only if the newly raised argument establishes 'fundamental error' or a denial of fundamental justice."); *cf. United States v. Johnson*, 945 F.3d 174, 178 (4th Cir. 2019) (quoting *United States v. Brewer*, 1 F.3d 1430, 1435 (4th Cir. 1993)) (explaining that "[w]hile our cases suggest that a limited purpose instruction need be given only upon request, they leave open the possibility that the district court must provide one *sua sponte* in some circumstances," though finding no plain error in the court's failure to do so in that case).

In civil cases, this Court has refused to undertake fundamental-error review where, as here, a party "never contended that the district court *fundamentally or even plainly erred*." *In re Under Seal*, 749 F.3d at 292; *see Tarashuk v. Givens*, 53 F.4th 154, 167 (4th Cir. 2022) (refusing to conduct fundamental-error review where appellants failed to assert that elements of such review were satisfied); *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015) (same).

As such, we need not rule on the merits of Howard's claims here. But we note that even if he had properly argued for fundamental-error review, it's not apparent that the

39

district court fundamentally erred by failing to take additional action sua sponte, where it had already sustained Howard's objection, defense counsel's comments were isolated in the context of a four-week trial, and the jury was charged that counsel's arguments were just that—arguments, not evidence. *See Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 352 (4th Cir. 2014) (concluding that it was not "reasonably probable" that isolated improper remarks at closing "subverted the jury's commitment 'to decide the issues on the evidence received and the law as given it by the trial court'" (quoting *Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186, 197 (4th Cir. 1982), *rev'd on other grounds*, 712 F.2d 899 (4th Cir. 1983) (en banc))); *cf. United States v. Byers*, 649 F.3d 197, 213 (4th Cir. 2011) ("[A] district court does not commit plain error merely because it fails to give curative instructions *sua sponte* any time improper evidence comes out during trial.").

Accordingly, we reject Howard's claims and affirm the jury's award.

IV.

On cross-appeal, Dowdy raises two challenges in support of his request for a new trial. First, he argues that the district court abused its discretion in permitting evidence via stipulation of Governor Cooper's Pardon of Innocence. And second, Dowdy argues that the court abused its discretion by refusing to dismiss a juror for cause after she made statements indicating she could not be impartial. We reject both arguments.

A.

Against Dowdy's objections, the district court allowed Howard to introduce evidence of Governor Cooper's Pardon of Innocence, although the court did not allow the pardon itself to be entered into evidence. The parties stipulated to two facts about the

40

pardon at trial—that Howard petitioned the governor for a Pardon of Innocence in 2017 and that ultimately, Governor Cooper granted a pardon in 2021. Additionally, the court gave a limiting instruction on the pardon, charging the jury that:

> You have heard evidence that Plaintiff Darryl Howard was granted a Pardon of Innocence from the Governor of North Carolina on April 30, 2021. This is the result of a request and petition submitted by Mr. Howard on or about November 1, 2017.

> The North Carolina state constitution allows for the Governor to grant a pardon upon whatever conditions he or she may think proper. There are no requirements, statutory or otherwise, placed on the Governor as far as what evidence must be considered with a request for a Pardon. There is similarly no established burden of proof that the Governor must apply for the issuance of a Pardon. The deliberations of the Governor's office to determine whether to issue any pardon are confidential and are therefore not publicly available.

> The Defendant, Darrell Dowdy, was not involved in the Pardon process.

> You should treat the Pardon as you would any other item of evidence and give it what weight, if any, you decide it deserves.

J.A. 3558–59.

On appeal, Dowdy contends the court's decision to permit Howard to present evidence about the pardon was an abuse of discretion. He argues that the pardon is irrelevant and that, even if it is relevant, any relevance is substantially outweighed by prejudice because the pardon doesn't constitute a finding of innocence; that the pardon doesn't comply with the North Carolina Constitution; and that it is inadmissible hearsay.

This Court recently rejected arguments akin to Dowdy's objections regarding the relative relevance and prejudice of the pardon in *Gilliam v. Allen*, 62 F.4th 829, 839 (4th Cir. 2023). In that case, two intellectually disabled teenagers were convicted of the rape and murder of a young girl. *Id.* at 834. Decades later, a state court vacated their convictions

41

based on significant new evidence that the men were innocent. *Id.* Shortly thereafter, then-North Carolina Governor Patrick McCrory granted each man a Pardon of Innocence, and they filed civil rights claims against the police officers who were involved in the investigation of their case. *Id.* at 838.

The *Gilliam* defendants unsuccessfully sought to prevent the introduction of the pardons at trial. On appeal, they argued the pardons were irrelevant because they were not conclusive proof of innocence, their introduction decided defendants' liability, and they should have been excluded under Rule 403. *Id.* at 838–39.

This Court affirmed the district court's decision to permit introduction of evidence regarding the pardons. We first recognized the relevance of the pardons to establishing a necessary prerequisite of the plaintiffs' claims—that their convictions were vacated by a final order based on significant evidence of innocence. *See id.* at 839. Moreover, we rejected any notion that the pardons were overly prejudicial under Rule 403, distinguishing their finding of innocence from the ultimate issue of the civil rights case: "the plaintiffs' guilt or innocence and the defendants' misconduct were not so necessarily linked as the defendants argue" and evidence of the pardons "did not prevent the defendants from challenging the allegations of their misconduct." *Id.* That is, "[i]f the plaintiffs' convictions were attributable to mistake, or to evidence later recanted or proved false, or simply to an innocent failure of the system, the defendants could not be held liable." *Id.* In sum, "what was at issue in [the *Gilliam*] trial [was] whether the plaintiffs' convictions were the result of misconduct on the part of the defendants. The Governor's pardons merely reflected a finding of the plaintiffs' innocence but did not demonstrate misconduct." *Id.*

42

Dowdy seeks to distinguish *Gilliam*, but his arguments are unavailing. He argues that the plaintiffs' pardons in *Gilliam* were based on a long investigation by the North Carolina Innocence Inquiry Commission ("NCIIC"), thereby making them probative as to the plaintiffs' innocence. Here, in contrast, Howard's claims were not investigated by the NCIIC, so, Dowdy contends, the pardon is not probative as to Howard's innocence.

We are not so convinced. Even though there was not a NCIIC investigation in this case, the Governor's pardon expressly relies on the superior court order vacating Howard's conviction, which itself made extensive factual findings. And in any event, the pardon is relevant to show the complete procedural history of Howard's criminal case. Accordingly, the Governor's pardon is relevant, just as the pardons in *Gilliam* were relevant. And the relevance is not substantially outweighed by prejudice, as the limitations of the Governor's pardon were noted in the court's jury instruction. *See* J.A. 3559 ("There are no requirements, statutory or otherwise, placed on the Governor as far as what evidence must be considered with a request for a Pardon.")

We find Dowdy's other arguments regarding the pardon unpersuasive as well. He claims the pardon was improper as a matter of state constitutional law, based on language in the North Carolina Constitution that provides for the Governor's pardon power: "[t]he Governor may grant reprieves, commutations, and pardons, *after conviction*." N.C. Const. art. III, § 5(6) (emphasis added). Dowdy contends that the "after conviction" requirement was not met here because Howard's convictions had already been vacated at the time of his pardon.

43

But even assuming we may consider an argument about the North Carolina Governor's powers under the North Carolina Constitution in deciding a federal evidentiary issue, we note that the Supreme Court of North Carolina rejected Dowdy's argument more than a century ago. In *State v. Alexander*, 76 N.C. 231 (1877), the court considered the same question—whether the governor could use the pardon power to pardon an individual whose conviction had been vacated—and held that he could, observing that the "after conviction" requirement was designed to prevent a governor from issuing *preemptive* pardons before a defendant was publicly tried. *Id.* at 232–34.

Lastly, we reject Dowdy's argument that the pardon was inadmissible hearsay. We agree with the district court that the pardon qualifies as a public record under Federal Rule of Evidence 803(8), an exception to the hearsay rule that allows for the admission in a civil case of "factual findings from a legally authorized investigation," as long as the opponent "does not show that the source of information or other circumstances indicate a lack of trustworthiness." The district court did not abuse its discretion in concluding that Dowdy did not meet his burden to show a lack of trustworthiness in the Governor's clemency investigation and ultimate pardon—a pardon that, by its language, relied in part on the findings of a superior court in Howard's post-conviction proceedings. Thus, we affirm the district court on this issue.

## B.

Finally, we consider Dowdy's appeal of the district court's decision to deny his for-cause challenge to Juror 7 on the basis that she could not be impartial.

44

When a district court considers a challenge for cause, "[t]he critical issue . . . is whether the juror 'could be fair and impartial and decide the case on the facts and law presented.'" *United States v. Hager*, 721 F.3d 167, 190 (4th Cir. 2013) (quoting *United States v. Capers*, 61 F.3d 1100, 1105 (4th Cir. 1995)). This Court will not overrule a district court's decision on such a challenge except for a manifest abuse of discretion. *Poynter*, 874 F.2d at 222. Indeed, a district court's decision not to excuse a juror for cause is entitled to "special deference." *Hager*, 721 F.3d at 190 (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)). That "high deference" stems from the fact that on review, "we are reviewing a cold record," whereas a district court is "on the scene," hears a juror's words, observes his demeanor, and judges his credibility. *Id.* at 193. "Thus, [a district court is] in a much better place than we to determine whether [a juror is] being truthful in his statements that there was no reason why he could not be fair." *Id.*

This Court has previously found an abuse of discretion where a court went forward with a juror after he "gave an equivocal response to repeated questions about his ability to proceed with an open mind." *United States v. Thompson*, 744 F.2d 1065, 1068 (4th Cir. 1984). In contrast, where a district court repeatedly followed up on a juror's initial skeptical answers to ask if there was any reason the juror could not be fair—and received appropriate answers to each question—we have upheld the court's decision to seat the juror. *See Hager*, 721 F.3d at 190–93.

In this case, the district court extensively questioned Juror 7 during voir dire about her experiences with law enforcement and the criminal justice system. She stated that in 2004, she was charged with larceny, but those charges were dismissed. When asked

45

whether that experience would make it difficult for her to be fair and impartial, she responded it would not.

She next identified that her partner had been convicted on a drug-related charge, and when asked if that experience would impact her, she mentioned it possibly could. The court asked several follow-up questions about how her partner's experiences might impact her. She first stated: "I guess I still have some feelings about how the whole—his trial went down, so I guess that could play a role in how I may see things or feel about certain things." J.A. 2576. She expressed some reservations based on his experience. Although she stated his experience wouldn't give either side an advantage in this case, she also "couldn't say for sure" whether she could set aside that experience. J.A. 2576–77. But when asked whether she would give more or less weight to testimony from law enforcement officers because of their jobs, she said she would not.

The district court then asked several questions requested by defense counsel. First, the court inquired whether Juror 7's partner had expressed that he was improperly treated in his criminal case. She stated, "I mean, other than him telling me that—like, how it went down when he was apprehended, no." J.A. 2581. The court asked whether she had a fear of police officers. She responded that she did have some fear, which made her drive slower, so she didn't "have to have an interaction with them if I do get pulled over." J.A. 2582. Then the court asked whether she had any reason to question the credibility of police officers. She replied that the media played a part in how she felt, and that "[i]t's just that there's been so much going on in the media, especially with African-American people, that it just puts a sour place, like, in my heart for police officers." J.A. 2582–83.

46

When the court inquired further, Juror 7 explained that she was concerned about cases in the media where people lost their lives after interactions with police. The district court finished its questioning by asking, "In light of your various things you have told us about, would any of those views in any way make it difficult for you to be fair and impartial in this case? In other words, would they tend to make it difficult for you to be fair and impartial to Mr. Dowdy, who is a detective with the Durham Police Department, or to Mr. Howard, as the Plaintiff?" J.A. 2583. Juror 7 responded, "I would say not. I don't know any background on the case or anything like that. I don't know anything of this officer and his behavior, his patterns or anything, so I would say no." J.A. 2583–84. Ultimately, the district court denied Dowdy's for-cause challenge.

As Dowdy emphasizes, Juror 7 expressed various concerns about police that, if not inquired into further, may have required her dismissal. She described her partner's negative experience with the criminal justice system and expressed concerns about Black people's experiences with police generally. But the district court also asked thorough questions to determine whether those experiences would make her unable to render a fair verdict in this case. Where she occasionally equivocated, the court probed further. And ultimately, Juror 7 gave unequivocal answers that she could be fair and impartial. That is, she stated she could be fair and impartial based on her own experiences; that she wouldn't give police officers' testimony more or less weight because they were in law enforcement; and that, lastly, when taking everything into account, her views wouldn't make it difficult for her to be fair and impartial to Dowdy or Howard.

47

The question before us is not whether we would have seated Juror 7 had we been sitting in the district court's shoes. There is no way to make such a determination from the cold record; the district court was "on the scene" and in a "much better place" than we are to assess whether Juror 7 was truthfully stating that she could be fair and impartial. *Hager*, 721 F.3d at 193. Accordingly, "because of the heightened deference that we give to the district court in matters such as this," we do not find reversible error here. *Id.*

V.

For the reasons detailed above, we affirm the district court's grant of summary judgment to the City of Durham and affirm the jury verdict against Dowdy. We reverse the grant of summary judgment to Pennica and Soucie and remand the case to the district court for further proceedings consistent with this opinion.[11]

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

---

[11] On remand, the district court can address the effect, if any, of the existing damages award on the claims against Pennica and Soucie.

48

QUATTLEBAUM, Circuit Judge, concurring in part and dissenting in part:

I agree with and concur in Parts I, II, III—B, III—C and IV of Judge Wynn's majority opinion. But I disagree with his conclusion in Part III—A that the district court erred in granting summary judgment to Officers Scott Pennica and Michele Soucie.

In a thorough order, the district court properly explained that for Howard to prevail on his claim that Pennica and Soucie violated his due process rights to post-conviction evidence by suppressing evidence of their 2011 interview with Jermeck Jones, he had to show that the officers acted in bad faith. *Jean v. Collins*, 221 F. 3d 656 (4th Cir. 2000) (en banc). That meant, as the district court also noted, that Howard had to "negate any negligent or innocent explanation for the actions on the part of the police." *Id*. at 663 (Wilkinson, J., concurring in the judgment).

Then, the district court concluded that Howard failed to present sufficient evidence to create a genuine issue of material fact that Pennica and Soucie acted with that state of mind. Significant in its decision was the fact that there was no active Durham Police Department investigation at the time of the interview. So, the only obligation to disclose the results of the interview was a September 2011 order in which the North Carolina superior court required the Durham Police Department and the District Attorney to share with Howard's counsel exculpatory information. But Howard's counsel acknowledged he did not serve the Durham Police Department with the order. He only served the District Attorney. And Durham Assistant District Attorney Dale Morrill, who was running point on the case at this time, testified that he could not recall if he served the Durham Police Department. What's more, Morrill does not recall speaking to Pennica—his contact with

49

the Durham Police Department on the post-conviction case—after the order was issued. For their part, Pennica and Soucie are unequivocal—they insist no one told them about the September 2011 order or the obligations of the police under it. Finally, there is no evidence anyone else notified the Durham Police Department generally, or Pennica and Soucie specifically, about the obligations of the police under the September 2011 order. Confronted with that evidence, the district court concluded the testimony that Morrill generally shares orders with the relevant agencies was insufficient to create a genuine issue of material fact.

I find no error in the district court's order granting summary judgment to Pennica and Soucie. I would not reverse that order.